U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
NEW YORK DISTRICT OFFICE
------------------------------------------------------------------X
DENISSE VILLALTA,

        *Applicant,*                 EEOC Charge No. 520-2015-01598

     -v-                        **RESPONDENT    JSBARKATS,
                                  PLLC'S POSITION STATEMENT**

JSBARKATS, PLLC,

        *Respondent.*
------------------------------------------------------------------X

      Respondent JSBarkats, PLLC ("JSB"), by and through its attorneys, JSBarkats, PLLC, as

and for its Position Statement filed in response to the Charge of Discrimination, dated February

6, 2015 ("Charge") of Applicant Denisse Villalta ("Villalta"), hereby allege as follows:

      1.      Admit the allegations contained in paragraphs 2 and 4 of the Charge.

      2.      Deny the allegations contained in paragraphs 5-15, 17-20 and footnote 1 of the

Charge.

      3.      Deny knowledge and information sufficient to form a belief as to the allegations

contained in paragraph 1 of the Charge.

      4.      Admit the allegation in paragraph 3 of the Charge that JSB is a law firm, and deny

the remaining allegations in the paragraph.

      5.      Admit the allegation in paragraph 16 of the Charge that applicant resigned from

employment with JSB, and deny the remaining allegations in the paragraph.


<u>**COUNTER-STATEMENT OF FACTS**</u>

      6.      JSB is a law firm with principal offices located at 18 East 41st Street, 14th Floor,

New York, New York.

7.     JSB is a firm committed to provide a harassment free work environment. Attached hereto as EXHIBIT "A" is a copy of the employee handbook, initialed and signed by Villalta, entitled "Law Firm Policy and Procedure" ("Handbook"), which contains the following relevant policies of Barkats:

**"Harassment Policy**

The firm is committed to providing a work environment that is free of sexual discrimination and harassment. Sexual harassment consists of unwelcome sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature when: (1) submission to such conduct is made (explicitly or implicitly) a condition of employment; (2) submission to or the rejection of such conduct affects the making of employment decisions concerning the employee; or (3) such conduct creates an intimidating, hostile, or offensive work environment or otherwise unreasonably interferes with an individual's work performance.

Examples of inappropriate conduct include, but are not limited to:

*Sexually explicit remarks, including written references to sexual conduct, gossip regarding an individual's body, sexual activities, and the like.*

Unwanted or offensive phone calls, grossly vulgar e-mails, notes, letters, sexually explicit text or inappropriate voicemail messages, and the like.

Allegations of harassment will be investigated and, if substantiated, corrective or disciplinary action will be taken, up to and including administrative review and/or termination of the employee.

***Sexual Harassment Defined:*** Sexual harassment is defined to include any of the above conduct as well as other unwelcome conduct, such as unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities, and other verbal or physical conduct of a sexual or gender based nature when:

Submission to such conduct is made either explicitly or implicitly, a term or condition of an individual's employment; or Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Continuing to express sexual or personal interest after being informed that the interest is unwelcome.

*Making reprisals, threats of reprisal, or implied threats of reprisal following a negative response.*

Engaging in implicit or explicit coercive sexual or gender-based behavior that is used to control, influence, or affect the career, salary, and/or work environment of another employee.

Offering favors of employment benefits, such as promotions, favorable performance evaluation, favorable assigned duties, recommendations, reclassifications, etc., in exchange for sexual favors.

Conversation about one's own or someone else's sex life.

Conduct or comments consistently targeted at only one gender, even if the content is not sexual.

Teasing or other conduct directed toward a person because of his or her gender.

**Reporting:** Employees who believe that the actions or words of a supervisor, owner, co-worker, or any other individual constitute unwelcome harassment have a responsibility to report the incident(s) as soon as possible to the firm management and/or the next level administrator who is not the subject of the complaint or the director of human resources in this case M. Teresa Daley in writing and through a meeting to unable the cessation of the behavior or reprimand in any fashion legally possible the individual misbehaving.

**Complaints of harassment will be fully and promptly investigated.** Any lawyer or other staff member who has been found by the firm to have harassed another employee or individual will be subject to appropriate disciplinary action, up to and including termination or discharge from the firm. The complainant will be informed of the completion of the investigation and of remedial actions taken.

No adverse action will be taken against a person for making a complaint of harassment when the complainant honestly believes harassment has occurred or is occurring or for participating in or cooperating with an investigation. Confidentiality will be preserved, consistent with applicable laws and the responsibility to investigate and address such complaints. Employees who believe that their complaint has not been satisfactorily resolved may make a written appeal to the executive officers of the firm. Where required by local law, additional procedures and requirements will

be followed. Please consult your supervisor or director of human resources for details."

Handbook, p. 4-5.

8.      Villalta was employed by JSB October 30, 2014 through October 31, 2014, and signed the Handbook on October 30, 2014 (EXHIBIT A).

9.      Prior to her employment at JSB, Villalta first meet the principal of the firm, Sunny J. Barkats ("Barkats"), in or about March of 2014 while engaged in a relationship with a family member of Barkats.

10.     From the winter of 2013 through the fall of 2014, Villalta was engaged in a casual sexual relationship with Daniel Hirsch, brother-in-law of Barkats.

11.     In March, 2014, Mr. Hirsch introduced Villalta to his sister and Barkats at the home of Mr. Hirsch. Villalta repeated smoked illegal cigarettes, and flirted with Barkats and other men at the house.

12.     In the Fall of 2014, Villalta, while dating Mr. Hirsch, continued her relationship with a married older man, a detective with the New York Police Department, who she called her "Mentor".

13.     Several months thereafter in early October, 2014, Villalta responded to an advertisement posted by Barkats on Craigslist for a non-committed relationship. Villalta informed Barkats she was looking for a "sugar daddy" to care for her financial needs in exchange for companionship. Barkats vocalized his disinterest in such an arrangement.

14.     To the best of Barkats recollection, during the course of their exchange about the non-committed relationship, Barkats informed Villalta that he was looking for a personal assistant at JSB for the Corporate Group. Villalta vocalized interest in the position.

15.     Barkats informed Villalta that:

a. their non-committed relationship would have no effect upon any decision to hire her as a personal assistant at JSB;

b. Barkats would authorize the Head of the Human Resources Department to have sole hiring authority, removing himself from the hiring decision;

c. their non-committed relationship was not a requirement of employment at JSB;

d. their non-committed relationship would not and could not affect any interactions at JSB;

e. Barkats would not show favoritism to her in the office; and

f. If hired, the continuation of their non-committed relationship was not a requirement for continue employment at JSB.

16.     On October 29, 2014, Villalta submitted a resume and was interviewed by Gillian Lawson, Comptroller and Head of the Human Resource Department, and William Dauber, Esq., partner and head of the Corporate Group. After said interviews, an offer was made for employment of Villalta as a personal assistant at JSB by Ms. Lawson.

17.     Following her interview on October 29, 2014, Villalta was given an offer of employment, which she accepted.

18.     Gillian Lawson sat down with Villalta and reviewed the Handbook. Villalta signed the Handbook and initialed each page.

19.     Villalta was informed that her first day of employment with JSB was to be October 30, 2014.

20.     As the personal assistant to the Corporate Group, Villalta's responsibilities consisted of:

a. reading, monitoring and responding to the emails of William Dauber, Michael Wheeler and Barkats;

b. preparing mailings for the Corporate Group;

c. liaising with staff, clients, etc.;

d. managing the electronic diaries of William Dauber, Michael Wheeler and Barkats;

e. booking meetings for William Dauber, Michael Wheeler and Barkats;

f. organizing travel and preparing itineraries;

g. preparing papers for meetings; and

h. typing documents, use of office software and desktop publishing.

21.     During the course of Villalta's employment with JSB, Barkats never demanded that Villalta engage in any sexual activities with himself or anyone else as a requirement of her employment at JSB.

22.     During the course of Villalta's employment with JSB, no employee, officer or partner of Barkats engaged in any discriminatory practice towards Villalta.

23.     During the course of Villalta's employment with JSB, no employee, officer or partner of Barkats created a hostile or harassing work environment towards Villalta.

24.     During the course of Villalta's employment with JSB, any and all sexual or personal acts between Villalta and Barkats were consensual, as provided in the Charge.

25.     During the course of Villalta's employment with JSB, any and all sexual or personal acts between Villalta and Barkats were welcomed and not harassing.

26.     Any and all physical contact between Villalta and Barkats was based upon a clear prior understanding between consenting adults.

27.     On October 31, 2014, a day after the official start date of the employment of Villalta, Villalta met with Barkats and informed him that she was not interested in being a

personal assistant for the Corporate Group, but rather wanted a "sugar daddy" relationship with an older man. Mr. Barkats restated his utter rejection of such a questionable relationship.

28.     On October 31, 2014, following the afforested meeting between Villalta and Barkats, Villalta left the offices of JSB never to return.

29.     Villalta was never terminated from JSB, and gave no notice of resignation.

30.     Barkats thereafter attempted to contact Villalta to confirm she was alright and to ascertain when she would return to work. Villalta represented that she had an emergency to deal with at college, and planned to return shortly. She never did.

31.     Maria Flores, a receptionist at JSB, called Villalta to ascertain if she was coming back to JSB, and to arrange to pay her for her day-and-a-half of work.

32.     Villalta further terminated her relationship with Barkats shortly thereafter on or about the end of November, 2014.

33.     At no point during Villalta's employment with JSB did Villalta report or complain of any harassing behavior, as expressly provided under the Handbook.

34.     Since October 31, 2014, Villalta has repeatedly contacted Barkats via Facebook to inform him of parties she is attending or hosting.

35.     In early 2015, Villalta contacted Barkats via telephone at least twice.  Barkats purposefully did not answer the calls, and the two did not speak.

36.     Furthermore, in February, 2015, Villalta sent and invitation to connect on LinkedIn to Barkats.


## FIRST AFFIRMATIVE DEFENSE

37.     The Charge fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

38.     Villalta's claims are barred by the doctrines of estoppels, waiver, laches and/or unclean hands.

## THIRD AFFIRMATIVE DEFENSE

39.     Villalta's claims are barred because it failed to mitigate its alleged damages, if any.

## FOURTH AFFIRMATIVE DEFENSE

40.     Any sexual acts between Villalta and Barkats were consensual, and not harassing or unwelcome.

41.     Villalta flirted with Barkats, and initiated many of the physical interactions between the two.

## FIFTH AFFIRMATIVE DEFENSE

42.     Villalta was not discriminated upon or harassed while employed at JSB.

43.     Villalta's employment was not terminated, and was offered a chance to return to JSB after addressing the fictitious emergency.

## SIXTH AFFIRMATIVE DEFENSE

44.     Villalta did not suffer a hostile or offensive work environment while employed at JSB.

**WHEREFORE**, respondent demands judgment against the applicant as follows:

(a)     dismissing the Charge on the merits with prejudice;

(b)     together with costs and disbursements of this matter;

(c)     sanctions against applicant and her counsel for frivolous conduct, including but not limited to the filing of the Charges, pursuant to 22 N.Y.C.R.R. § 130-1.1;

(d)     reasonable attorney's fees; and

(e)     such other, further and different relief as this district office may deem just and proper.

Dated: New York, New York
      June 26, 2015

JS BARKATS, PLLC

By: _____
    SUNNY J. BARKATS
    18 East 41St Street, 14th Floor
    New York, New York 10017
    Telephone: (646) 502-7001

TO:     Borrelli & Associates, P.L.L.C.
        1010 Northern Boulevard, Suite 328
        Great Neck, New York 11021
        Telephone: (516) 248-5550

## CERTIFICATE OF SERVICE

I, the undersigned, have served the foregoing document to the persons indicated below by means indicated below and on the date of signature below:

1. Via First Class Mail to:

                    John Douglass, Enforcement Supervisor
                    U.S. EEOC – NYDO
                    33 Whitehall Street, 5th Floor
                    New York, New York 10004-2112

                    Borrelli & Associates, P.L.L.C.
                    1010 Northern Boulevard, Suite 328
                    Great Neck, New York 11021

Dated: New York, New York
       June 26, 2015                JS BARKATS, PLLC

                                          By:
                                       Marc Jonas Block
                                    18 East 41St Street, 14th Floor
                                    New York, New York 10017
                                    Telephone: (646) 502-7001

# Exhibit A

# 2014



Attorneys At Law

## Viam Inveniemus Aut Faciemus
### WE WILL EITHER FIND A WAY OR MAKE ONE

18 East 41st Street, New York, NY 10017, 14th Floor
www.JSBarkats.com
646-502-7001

# LAW FIRM POLICY AND PROCEDURE



**BINDING FIRM POLICY AND OBLIGATIONS OF THE GROUP**

**Disclaimer—No Employment Contract**

This law office manual is designed to provide a written description of various law-firm processes and procedures. It is provided to all lawyers and employees to help them become more aware of and comfortable with day-to-day routine law office operations and processes and the overlapping roles of various staff members. This manual is not intended to create or constitute any type of employment contract.

**Firm Objective**

The primary objective of this firm is:

To be the premier business-law office in its regional service area including New York, New Jersey and eventually Connecticut, thus, meeting the needs of mid- to high-end clientele with sensitivity, while maintaining the highest professional standards.

**Further objectives of the firm are:**

To have a well-organized, well-managed, productive law firm that can make a profitable contribution to our clients and to the legal system;

To provide a work product that is timely, accurate, and of value to our clients;

To be fair, honest, and ethical in all dealings with our clients, employees, court personnel, opposing counsel, and vendors;

To be always in pursuit of new procedures and products designed to benefit the firm, our employees within reason, and our clients; and

To do everything in our power to make this firm a good place in which to work and an asset to both our social and legal communities.

**Disciplinary Action**

Unless the conduct is intolerable, and in the event a problem arises with an employee of the firm, the managing partners with regard to the problem should handle the requested correction and shall first counsel such employee verbally in closed session, with a follow-up review at some time certain in the

*Initial all pages.*

immediate future. (Unless such problem is deemed intolerable and therefore such employee or member may be immediately terminated.) However, if the problem continues after this counseling session, the partners shall issue a formal written warning that will be presented to the employee in closed session. Employee will be asked to sign the warning as to the fact that employee has read and understands the contents of the warning. Such signature does not indicate agreement with the warning. Again, a review period of a time certain will be indicated, along with an explanation of any possible further discipline in this matter. A copy of the written warning will be placed in the employee's personnel folder and a copy will be given to the employee for his/her personal file. If the problem continues beyond the written warning, further disciplinary action will be taken—up to and including termination of employment.

## Employment at Will

Employment with the company is voluntarily entered into, and the employee is free to terminate his/her employment at will at any time, with or without cause. Similarly, the firm may terminate the employment relationship at will at any time, with or without notice or cause. Policies set forth in this handbook are not intended to create a contract, nor are they to be construed to constitute contractual obligations of any kind or a contract of employment between the firm and any of its employees. The provisions of the handbook have been developed at the discretion of firm management and, except for its policy of employment-at-will, may be amended or cancelled at any time, at the firm's sole discretion.

## Equal Employment Opportunity

To provide equal employment and advancement opportunities to all individuals, employment decisions at the firm will be based on merit, qualifications, and abilities. The firm will not and does not discriminate against or harass any employee or applicant for employment because of race, color, creed, religion, national origin, sex, handicap or physical or mental disability, perceived disability, age, marital status, sexual orientation, citizenship status, military status, status with regard to public assistance, or any other characteristic protected by federal, state, or local law. The firm is an equal opportunity employer. Our policy of equal employment opportunity is to recruit, hire, and assign the best qualified personnel in all of our centers and offices and to provide equal employment opportunities with respect to the retention, compensation, advancement, and development of all employees in a manner that will not discriminate against any person because of race, color, religion, age, sex, sexual orientation, marital status, national origin, ancestry, physical or mental handicap, military status, or any other reason prohibited by the fair employment laws. Any question or concern about equal employment opportunity should be brought to the attention of the human resources department managed by Ms. Daley.

## Family and Medical Leave

The Family and Medical Leave Act of 1993 (FMLA) is a federal law that, in general, requires covered employers to provide up to 12 weeks of unpaid, job-protected family medical leave (FML) to eligible employees for certain family and medical reasons. The FMLA defines eligible employees as employees who (1) have worked for the firm for at least 9 months, (2) have worked for the firm for at least 1,250 hours in the previous 12 months, and (3) work at or report to a worksite that has 50 or more employees or is within 75 miles of worksites that taken together have a total of 50 or more employees.

The firm grants for 5 pay days of sick days with a doctor's note only, and after determining whether an employee has worked for the firm for at least 9 consecutive months.

The firm allows for employees to voluntarily participate in any of its plans and health insurance, life insurance, and disability coverage for the full period of the approved FML, available at the time at their own expenses unless determined otherwise.

If an employee fails to return to work on the agreed upon date, the firm will assume that the employee has resigned. The termination date will be the expiration date of the leave.

**Harassment Policy**

The firm is committed to providing a work environment that is free of sexual discrimination and harassment. Sexual harassment consists of unwelcome sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature when: (1) submission to such conduct is made (explicitly or implicitly) a condition of employment; (2) submission to or the rejection of such conduct affects the making of employment decisions concerning the employee; or (3) such conduct creates an intimidating, hostile, or offensive work environment or otherwise unreasonably interferes with an individual's work performance.

Examples of inappropriate conduct include, but are not limited to:

_Sexually explicit remarks, including written references to sexual conduct, gossip regarding an individual's body, sexual activities, and the like._

Unwanted or offensive phone calls, grossly vulgar e-mails, notes, letters, sexually explicit text or inappropriate voicemail messages, and the like.

Allegations of harassment will be investigated and, if substantiated, corrective or disciplinary action will be taken, up to and including administrative review and/or termination of the employee.

**_Sexual Harassment Defined_**: Sexual harassment is defined to include any of the above conduct as well as other unwelcome conduct, such as unsolicited sexual advances, requests for sexual favors, conversations regarding sexual activities, and other verbal or physical conduct of a sexual or gender-based nature when:

Submission to such conduct is made either explicitly or implicitly, a term or condition of an individual's employment; or Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting the individual; or Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Continuing to express sexual or personal interest after being informed that the interest is unwelcome.

_Making reprisals, threats of reprisal, or implied threats of reprisal following a negative response._

Engaging in implicit or explicit coercive sexual or gender-based behavior that is used to control, influence, or affect the career, salary, and/or work environment of another employee.

Offering favors of employment benefits, such as promotions, favorable performance evaluation, favorable assigned duties, recommendations, reclassifications, etc., in exchange for sexual favors.

Conversation about one's own or someone else's sex life.

Conduct or comments consistently targeted at only one gender, even if the content is not sexual.

Teasing or other conduct directed toward a person because of his or her gender.

**Reporting:** *Employees who believe that the actions or words of a supervisor, owner, co-worker, or any other individual constitute unwelcome harassment have a responsibility to report the incident(s) as soon as possible to the firm management and/or the next level administrator who is not the subject of the complaint or the director of human resources in this case MS. Teresa Daley in writing and through a meeting to unable the cessation of the behavior or reprimand in any fashion legally possible the individual misbehaving.*

**Complaints of harassment will be fully and promptly investigated.** Any lawyer or other staff member who has been found by the firm to have harassed another employee or individual will be subject to appropriate disciplinary action, up to and including termination or discharge from the firm. The complainant will be informed of the completion of the investigation and of remedial actions taken.

No adverse action will be taken against a person for making a complaint of harassment when the complainant honestly believes harassment has occurred or is occurring or for participating in or cooperating with an investigation. Confidentiality will be preserved, consistent with applicable laws and the responsibility to investigate and address such complaints. Employees who believe that their complaint has not been satisfactorily resolved may make a written appeal to the executive officers of the firm. Where required by local law, additional procedures and requirements will be followed. Please consult your supervisor or director of human resources for details.

**Employee Conduct**

Appropriate and professional behavior

E-mail, the Internet, & Pornography

The computer and access to the Internet and e-mail are essential tools in our office. However, we must use these tools with restraint and discipline. All attorneys and staff must remember that these tools are for office use only and that there are laws and ethical rules applicable to their use. The following is a list of rules and warnings for their use. Each staff member must remember that firm tools, computers, software and equipment are the property of the firm and may be inspected at any time by management. This list is not all-inclusive, and staff members are expected to conduct themselves with regard to these tools in a professional, ethical and moral manner, whether or not a specific conduct is

covered here:  The office computers and the software and Internet access are for business purposes only. No staff member is to use this equipment for personal communications or for game playing.

The Internet is for business use only and may not be used for personal matters without prior permission of management. The Internet is not to be used at all for nonbusiness use during business hours.

E-mail is for business use only and not for personal matters without prior permission of management. E-mail is not to be used for nonbusiness communications during business hours.

Pornography: Viewing of pornographic materials on the computer, whether over the Internet or through e-mail or any other means, is expressly and completely forbidden unless associated with a case or a matter. Viewing such material without a business purpose will result in termination. Child pornography is illegal, and its viewing or introduction into the firm in any way is expressly forbidden under any circumstances. If, in the course of an investigation in a case, you discover this type of material, stop work immediately and consult management as to how to handle it. If pornographic or illegal child pornography is encountered, make a written report to management immediately. It is unclear at this time under what, if any, circumstances attorneys may possess such material as part of their service as attorneys, so, extreme caution must be exercised. In all cases involving such evidence, seek and obtain written advice from management. When in doubt, store such evidence outside of the premises of the firm.

Under no circumstances should anyone receive or review or send e-mail with pornographic, off color, or immoral material. Do not forward jokes, funny stories, or other material to others where such material is not related to a case the firm is working on. If such material must be received, reviewed, sent or forwarded as part of work on a case, seek and obtain permission to do so.

## Office Etiquette Confidentiality and Non-Disparagement

Loyalty is one of the most highly prized qualities of an employee of this office. This means, in part, keeping confidential all client and office business, not airing personnel grievances outside the office, and addressing personal complaints or grievances through appropriate channels.

It is the goal of this office to have long-term employees. Frequent turnover not only damages the morale of everyone else in the office, but also is extremely disruptive to work in progress, client affairs, and the efficient use of staff and professional time.

Obviously, circumstances arise that sometimes make a job move necessary and desirable. If you anticipate such a move, please give adequate notification so that we may interview and hire a replacement. Two weeks' notice, while legally adequate, is insufficient as a practical matter. Thirty days' notice would be appreciated especially from attorneys deemed professionals.

As part of JSBARKATS, PLLC's office policy, and in an effort to maintain harmony in the workplace and a good work relationship between employees, the Employee, commit hereby as follows unilaterally:

- That The Employee shall not engage in any conduct geared to disparage each other, any partner of the Firm, or other Firm employees in an effort to attempt to ruin the reputation of either the Employee, Firm, partner of the Firm or other Firm Employees by either submitting, publishing, posting or in any other written manner cause disparaging commentaries to be submitted, published or posted on any internet website, social media outlet, or other written media or press outlet.
- The provisions contained herein shall survive the termination of employment;
- The provisions contained herein shall not apply to disclosures required by applicable law, regulation, order of a court or governmental agency, or in any litigation between the parties to the extent that such disclosures are not defamatory.

Breach of any provision contained in this firm's policy shall be subject to compensatory, special, and/or punitive damages to be determined by a court having jurisdiction over any action or proceeding commenced by either party against the other for breach of this agreement.

**Attitude and Cooperation**

Staff members are required to maintain the place clean, and have some chores including small vacuuming schedule and dusting, staff members refusing to participate in the maintenance of our office may be immediately terminated for cause.

Attorneys, paralegals, and secretaries all work together for the firm and for the benefit of its clients. In a small law office such as ours, everyone is required from time to time to "pitch in" and help others when workloads so demand. By being helpful and cooperative with each other, our workday will be far more pleasant and satisfying for everyone.

Engaging in pettiness and personalities quickly destroys the pleasant and warm environment we want in our office. There is no place here for harboring a grudge. If differences develop between you and another person in this office, speak directly with that person and immediately attempt to resolve the problem in a quiet, peaceful, and reasonable manner. If necessary, talk with human resources about problems such department is under the leadership of Ms. Daley as of today.

**Confidentiality**

The ethical codes of the American Bar Association and of the state bar apply not only to attorneys, but also to their employees. An attorney's work and all communications on behalf of a client are strictly confidential. Consequently, all work and conversation in the office is confidential and may not be discussed with anyone not working in the office, including spouses, judges, other attorneys, paralegals, and secretaries. This extends to public record information about publicized cases we handle. It is unethical to reveal to persons not employed by our firm even the fact that we represent a particular client for any reason whatsoever without the client's permission.

When talking on the telephone, do not reveal any information about a case or client unless specifically authorized to do so. Do not use a client's name when other clients or other persons may overhear. When meeting with clients, files and written material relating to other clients should not be visible.

Nothing is more damaging to a family-law practitioner than the perception in the community that a client's business is talked about outside the office.

**Bookkeeping**

All the process can be handled by the Firm's Comptroller.

However as a backup all process is also managebale as follows:

The firm maintains a dual-entry system to reflect payments made to clients' accounts. The office manager sets up a client file on the Clio program and enters all payments there. The secretaries set up a client file in Clio matters and on the server. The administrative Comptroller attorney records all deposits on the Quickbooks program. Two copies of all incoming checks are made. One goes into the check chronological file and the other to the left side of the client's billing subfile. Original checks go to the administrative attorney's office after copies have been made.

Credit-card-payment receipts are handled as follows:

White copy is kept in the client file.

Signed copy is provided to the client (if telephone authorization, the yellow copy is mailed to the client).

A photocopy is provided to the administrative attorney for recording in Quickbooks.

Current ledgers are kept in the library.

Client Files—Release

We do not give our client files to anyone (including the client, other attorneys, etc.). One exception is that we do loan the file to attorneys who are covering the case at a hearing in place of a firm attorney who is unable to attend.

Typically, we mail copies of all pleadings and correspondence to the client during the course of our representation. If the client has satisfied all financial obligations to us, an additional copy of these documents (but not attorney's, paralegal's, or secretary's notes) and client-provided originals may be returned to the client (copies made are at the client's additional expense).

Always clear the release of anything with an attorney. Complete a removal-of-documents form, have the client sign a receipt for the removed documents (can be done on the form), and file the form in the main client file. Because there is a 30-day appeal time, we generally do not release originals, depositions, etc., before 30 days from entry of a final order.

**Docket Control**

Docket control is essential to a legal practice. One major malpractice risk is missed deadlines.

Court Hearings: As soon as they are known, court hearings are entered in three places:

1. The attorney's desk calendar,

2. The attorney's pocket calendar,

3. Clio Manager on the secretary's computer.

In addition, a Secretary maintains another calendar on his/her computer.

Attorneys ( _____ and _____ ) and secretary ( _____ ) make entries. Compare frequently (every one to two days) desk calendar and computer calendar entries.

Docket Control Deadlines: Paralegals will enter all deadlines, including statutes of limitation, discovery due dates, pretrial dates, and hearing dates that require subpoenas, in the LPI tickler file and in the "tasks" column of the time management calendar. Adequate advance notice dates shall be included in the tickler file. The paralegal also will check the tickler file daily.

Minimum advance notice dates include:

Statutes of limitations: 3 months

30-day discovery: 2 weeks

Subpoena hearings: 2 weeks

Settlement conferences: 1 week

Confirmation of OSC: 3 days before the OSC

Pretrial statements: 1 week

Many tickled dates reflect paralegal responsibilities, especially regarding discovery and confirmation of OSCs. The paralegal should prepare the documents in a timely fashion and have them approved by an attorney far enough in advance of the deadline to permit revision.

The paralegal shall notify the responsible attorney well in advance of all tickled dates and have personal contact with the attorney on the day before the deadline date to make sure that the task is completed (unless the paralegal has seen that the appropriate document has been filed). Do not merely place the tickler on the attorney's desk.

## Telephones

We use voice over IP telephone hardware and Timewarners telephone line system by 8@8. Each of these systems has an information book, which you should keep at your desk (we have enough copies for each telephone set). Each telephone is assigned a station number, which is used for intercom,

transferring, and conferencing calls. Speed dial numbers are the same on all telephone sets. Post an index of these near your phone. In addition, you may program 15 speed dial numbers that are accessed only from your set. Keep an index of these behind the blue cover on your set.

If you do not want to program these yourself, ask the IT personnel for assistance.

Flashing light patterns and ring patterns mean different things, so refer to your telephone instruction booklet for this information.

The receptionist must be well versed in our system and collect messages in every telephone at the beginning of each day.

Etiquette: For most clients the first contact with a law firm is by telephone. This first contact creates an immediate and continuing image of the firm in a client's mind, which can favorably or unfavorably affect our relationship with that client. In the past, we have actually lost a potential client due to a secretary's perceived attitude toward the caller. The reception and service provided over the telephone can do much to create an impression of a courteous, efficient, and helpful firm and instill confidence in the client. Make every effort to help clients understand that their concerns are important to all members of the firm.

If a caller must be placed on hold, check back frequently to see if he or she wishes to continue to wait or prefers to leave a message. If an attorney is unavailable, offer to have the caller talk with the paralegal or the associate.

**Tell clients who call that the attorney is "with a client," "in a deposition," "in court," or "attending a conference." Never say that she is "busy" or "unavailable." When the attorney is with someone, offer to take the client's message so that the attorney can return the call. This reflects respect for the importance of the client's call. Never ask who is calling after telling the client why the attorney is unavailable. Otherwise it appears that you are making excuses or the client is a "low priority."**

Messages: Take all telephone messages on the tablet provided. Fill in the name of the caller, his or her telephone number, the person called, and date and time of call. Include your initials in case a message needs further explanation or knowing who took the message later becomes important.

Complete each message in detail. Always record the caller's phone number and repeat it back for verification. Even if the caller says that we have the number, record it. Always record the caller's last name. We often have several clients with the same first name. Ask the caller to spell any name you are not sure of to avoid potential embarrassment when the call is returned.

The white copy of the message goes in the holder on the desk. The yellow copy remains in the notebook to provide a record. Old telephone notebooks are kept in the storage room. Fill in the date started and the date completed on the cover of each phone message notebook.



Record longer messages on white copy paper and leave it in the holder. Attorneys and paralegals should pick up messages from the holder. If the call appears important and the person called is in the office, hand deliver the call record to that person.

Never provide home or cell telephone numbers to anyone other than another attorney. Never provide any information about clients. Do not confirm that someone is a client. Explain that you are not allowed to provide such information without an attorney's direct authorization.

Long-Distance Calls: We use 8@8 for long distance service. After dialing a long distance number the usual way (1-area code and number), you will get a dial tone.

1. For office calls, dial "_____."

2. For client-chargeable calls, dial the last three digits of the computer (billing) number.

Law Office Management

How the process works

Office Machine Servicing

All service contracts are listed on the speed dial index. Companies can be called by using the two-digit memory number.

The copy machine is serviced by _____ . All copies MUST assigned to their case No. or a monthly fee will be taken out of employees salary equally.

We also order toner and toner bags through _____.

We have a service contract, so call them if there are any problems. They are located at _____ .

We also have a service contract for all computers and printers with _____ . The company is located at _____ . _____ is our sales representative. Ask for _____ for service. If company personnel cannot help over the phone, take the equipment to them. We deal with various people about software problems, so check with _____ about that.

**Office Procedures Manual**

Emergency Procedures: If an attorney or paralegal is not available, and you have an emergency question, call _____ (number is on the system speed-dial index). Leave a message on her answering machine, as she monitors it closely.

Call 911 for all obvious emergencies (fire, police, or medical).

**Office Security**

Doors: Before leaving for lunch, if nobody else is in the office, check outside doors to make sure they are locked. Always lock the front door when you leave for the evening or ask for the elevator to be locked if

$D_V$

you are the last one, make sure all lights are off. The paralegal/secretary is responsible for keeping the door to the executive offices locked or the elevator lock closed. The associate is responsible for keeping the outside door of the associate's office closed when leaving. To prevent accidental entry, keep these two doors locked most of the time. The last person to leave should make sure that all exterior doors are locked as well as elevator key is off.

**Note**

Law Office Staff Manual Policies and Procedures: General Employment Policies for All Staff, Associates, and Partners, 2014, **JSBarkats PLLC**

**EMPLOYEE**

**AGREED AND AKNOWLEDGED**

BY:

Name DENISSE VILLALTA

SS#_ █████████



**JSBarkats**
PLLC
Attorneys At Law

**Dress Code for *JSBarkats***

We at *JSBarkats* strive to have the appearance of the office and its employees reflect the quality of our work.  It is our intent that work attire should complement an environment that reflects an efficient, orderly, and professionally operated organization.  This policy is intended to define appropriate "business attire" during normal business operations on Monday through Thursday and "casual business attire" on Fridays. *JSBarkats* reserves the right to continue, extend, revise or revoke this policy at its own discretion.

**Appropriate Business Attire**

Business attire is to be worn Monday through Thursday.  Appropriate business attire includes the following:

*Men:*

**<u>From September 15th to May 1st</u>**

- Blazers, suits, or sport coats
- Dress slacks
- Ties
- Dress shirts with buttons and collars
- Dress shoes/elegant Loafers such shoes must be shined at least once a week!!!

***Good smell and personal Hygiene are also expected and required, a shower and some perfume is highly suggested.***

*Women:*

- Dresses
- Skirts
- Dress slacks
- Blouses
- Blazers, suits, or sports coats
- Dress shoes (always heels)
- Sweaters

**Appropriate Casual Business Attire**

*Men:*

- Sports coats or blazers
- Slacks, Chinos or Dockers
- Oxford button-down shirts
- Sweaters and cardigans
- Loafers

*Women:*

- Slacks
- Stirrup pants/tights
- Polo shirts with collars
- Loafers and boots
- Casual dresses
- Cardigan/Sweaters
- Dark Pants

**Unacceptable Attire**

- Plain or pocket T-shirts
- Cutoffs
- T-Shirts with logos
- Athletic wear
- Flip flops
- **Blue denim jeans**
- Spandex or Lycra such as biker shorts
- Tennis shoes
- Jeans
- Tank tops, tube tops, halter tops, or any top with spaghetti straps.
- Deck shoes
- Midriff length tops
- Off-the-shoulder tops
- Workout clothes or shoes

The key point in sustaining an appropriate casual business attire program is the use of common sense and good judgment. Any person coming to work dressed inappropriately will be instructed to return home [on their own time] to change into more appropriate dress. Requests for advice and assistance in administrating or interpreting the guideline should be directed to Sunny Barkats.