UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                        :
DENISSE VILLALTA,                                       :
                                                        :
                          Plaintiff,                    :
                                                        :
         - against -                                    :
                                                        :
JS BARKATS, P.L.L.C., and SUNNY                         :
BARKATS,                                                :
                                                        :
                          Defendants.                   :
------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __4/16/2021__

16-CV-2772 (RA) (RWL)

**REPORT AND RECOMMENDATION
TO HON. RONNIE ABRAMS:
<u>DAMAGES INQUEST</u>**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Denisse Villalta filed this lawsuit against Sunny Barkats, presently a fugitive in France, and his law firm, JS Barkats, P.L.L.C. ("JSB") (together, "Defendants"), seeking recourse for egregious acts of *quid quo pro* sexual harassment and hostile work environment.  Villalta claims gender discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, and sex discrimination and harassment in violation of the New York City Human Rights Law (the "NYCHRL").  After years during which Defendants failed to participate in discovery, disregarded court orders, pursued meritless ploys to derail or delay this case, threatened Villalta, and even sought to purchase her testimony, the Court entered default judgment.  The matter now has been referred for inquest on damages.  For the reasons set forth below, I recommend awarding Plaintiff $24,352.85 in lost wages damages inclusive of pre-judgment interest, $350,000 for emotional harm, $700,000 punitive damages, $128,056.74 as reasonable attorneys' fees, $2,285.28 for costs, and post-judgment interest to be determined by the Clerk of Court.

1

**Facts**[1]

Because of the nature and magnitude of the damages sought, the Court sets forth the facts in detail.

## A.  Barkats Extracts Sex For Employment

Defendant JSB is a Manhattan-based law firm that, as of the relevant time, employed over twenty attorneys and had several practice areas.  Defendant Barkats, an attorney, is the founding partner of JSB.  On JSB's website, Barkats promoted himself as being one of the "top corporate and securities attorneys," while JSB boasted that it is a "national leader" in its chosen fields.  (Compl. ¶ 11.[2])

In 2014, Villalta was nineteen years old.  (Compl. ¶ 2.)  She was an indebted college student without health benefits.  She needed a full-time job to pay thousands of dollars for tuition and health insurance.  (Compl. ¶ 21.)  Accordingly, on October 27, 2014, Villalta applied for a position as Receptionist/Personal Assistant at JSB.  (Compl. ¶ 12.)

That same day, the firm scheduled an interview with Villalta.  (Compl. ¶ 13.)  Villalta interviewed for the Receptionist/Personal Assistant position at JSB on October 29, 2014.  (Compl. ¶ 14.)  After Villalta completed an initial interview with a female employee, Barkats summoned Villalta into his private office for what Villalta believed to

---

[1] The facts are drawn from the Complaint (Dkt. 1) ("Compl."); Plaintiff's Proposed Findings of Fact (Dkt. 104 at 2-8) ("FFCL"); and the affidavits and declarations of Denisse Villalta (Dkt. 112) ("Villalta Decl."), Lauren Urban (Dkt. 113) ("Urban Decl."), Stacey Spinelli (Dkt. 114) ("Spinelli Aff."), Neera Shivecharan (Dkt. 115) ("Shivecharan Aff."), and Michael R. Minkoff (Dkt. 111) ("Minkoff Decl."), along with their supporting exhibits.

[2] Unless otherwise indicated, a sentence without a citation is supported by the citation that appears next.  Thus, for instance, if a citation applies to all statements in a paragraph, it appears only at the end of the paragraph.

be a second interview.  (Compl. ¶ 15.)  Five minutes into the interview, Barkats asked Villalta to lock his office door.  Villalta did as Barkats asked.  (Compl. ¶ 16.)

Barkats then ordered Villalta to strip naked, claiming that he wanted to see if she would be "obedient."  (Compl. ¶ 17.)  Feeling intimidated and nervous, Villalta complied. (Compl. ¶ 18.)  Once Villalta was naked, Barkats forced Villalta to bend over, at which point he performed oral sex on her from behind.  Barkats then unzipped his pants, pulled out his penis, and proceeded to have sexual intercourse with Villalta.  (Compl. ¶ 19.)

During intercourse, Barkats told Villalta that she now belonged to him and that she would be required to have a "threesome" with him and his wife.  Barkats then forced Villalta to perform oral sex on him and swallow his ejaculate, explaining that Villalta needed to do so if she wanted the job.  (Compl. ¶ 20.)

In debt and in need of a job and health insurance, Villalta did as Barkats asked. In exchange, Barkats offered Villalta the job, with a starting salary of $30,000 per year and health benefits.  Barkats also promised Villalta that he would personally mentor her and promote her to a paralegal position in a few months so that she could earn a higher salary – if she remained "obedient." (Compl. ¶ 21.)   Villalta accepted the job offer. (Compl. ¶ 22.)

**B.    Barkats Coerces Villalta To Have Sex On Her First Day of Work**

On October 30, 2014, Villalta reported to her first day of work.  (Compl. ¶ 23.) When Barkats arrived at the office that day, he summoned Villalta to his office and informed her that if she continued to do as he said, he would make sure that she could live a "comfortable life," and even offered to rent her a Manhattan apartment for her

exclusive use.  Barkats also gave Villalta $40 in cash so that she could leave work for a short period to purchase a new shirt.  (Compl. ¶ 24.)

Shortly thereafter, Barkats summoned Villalta to his office again by stating that he had some work tasks for her.  Barkats directed Villalta to lock the door.  Although Barkats was on the phone with a client when Villalta entered his office, Barkats muted the phone call, directed Villalta to sit on the chair in front of him, and ordered her to "start playing with [her]self" so that he could watch; Barkats then unzipped his pants and began to masturbate.  (Compl. ¶ 25.)

While Barkats remained on the phone call with his client, he again muted the call momentarily to instruct Villalta to perform oral sex on him.  Barkats turned around, bent over, presented Villalta his bare buttocks, and directed Villalta to "clean [his] ass," gesturing that she should do so with her mouth.  (Compl. ¶ 26.)  A few minutes later, Barkats ended the phone call with his client and forced Villalta to have sexual intercourse with him.  While penetrating her, Barkats began to forcefully choke and threaten Villalta, stating, "If I catch you with someone else, I will kill you.  You belong to me."  (Compl. ¶ 27.)

As Barkats proceeded to have sexual intercourse with Villalta, another JSB attorney knocked at the door.  Barkats abruptly stopped having sexual intercourse with Villalta, pushed her aside, and quietly directed her to get dressed while he scrambled to put his own pants back on.  (Compl. ¶ 28.)  To create the charade that he was discussing work assignments with Villalta, Barkats loudly began to issue orders to Villalta.  (Compl. ¶ 29.)

Sometime later that day Barkats approached Villalta when she was alone, said that he was concerned that Villalta may have an "STD" or "HIV," and ordered her to get tested for sexually transmitted diseases before coming into work the next day. (Compl. ¶ 31.) The following day, when Villalta returned to work, Barkats asked her the results of her STD testing. Villalta began to explain that she had not complied with his request, at which point Barkats ordered her to go to the doctor by 4:00 p.m. that day or else he would terminate her employment. (Compl. ¶ 32.) Feeling humiliated, exploited, and unable to put up with Barkats' treatment of her any longer, Villalta left the office and never returned. (Compl. ¶ 33.)

## C.   Barkats Continues To Harrass Villalta

Later that day, Barkats texted Villalta multiple times, inviting her to come back to the office and/or meet him for dinner. Villalta did not respond. (Compl. ¶ 35.) Barkats had a receptionist attempt to call Villalta and then email her on Barkats' behalf, stating, "Mr. B. just want to know if you are okay? Can you please call or email him to let him know as soon as possible, thanks." Villalta did not respond. (Compl. ¶ 36.) Undeterred, Barkats sent threatening text messages to Villalta, including a text with a menacing photograph of Barkats holding a large steak knife. (Compl. ¶ 37; *see* Villalta Decl. Ex. B at 9.)

Feeling threatened and reminded that a day earlier Barkats had choked her, told her she belonged to him, and threatened to kill her, Villalta feared that she would only further anger Barkats by ignoring his texts. Villalta therefore decided to respond by making excuses as to why she could not meet with Barkats. (Compl. ¶ 38.) Barkats then tried to reach Villalta by cell phone multiple times, including over the weekend.

5

Villalta did not answer the calls.  (Compl. ¶ 39.)   When Villalta did not return to work on Monday, November 3, 2014, Barkats and his receptionist both attempted to call Villalta. Villalta did not answer.  (Compl. ¶ 40.)

Barkats' attempts to contact Villalta did not cease, even after she filed this action. As recently as November 2019, Barkats texted Villalta, saying that he planned to invest in a "film" about "[his] version" of events and Villalta's that would be sexually explicit and would "propagate" on the internet and become "widespread."  Barkats even threatened that Villalta's young son would "see his mom claiming she licks assholes for $12 bucks." At the same time, Barkats suggested that Villalta could earn "big bucks" if she testified that Barkats did nothing wrong.   Then, again in early 2020, Barkats texted Villalta, urging her to contact him "and see how rewarding the truth can be."  (Villalta Decl. ¶ 15 and Ex. B at 12-13, 16.)  Barkats thus not only harassed and threatened Villalta but also offered to buy her testimony.

### D.  Villalta's Emotional State Following Barkats' Treatment Of Her

In June 2015, Villalta started seeing a therapist – Lauren Urban, LCSW – for the first time in her life.  She experienced paranoia that Barkats would try to find and hurt her.  Villalta could not bring herself to get involved in romantic relationships as she was becoming more afraid to interact with men.  Villalta saw the therapist sporadically until November 2015.  Villalta felt her condition was not improving, and she was struggling financially.[3]   (Villalta Decl. ¶ 16.)  Villalta's condition is corroborated by the treatment notes of her therapist.   (Urban Decl. Ex. A.)   The treatment notes, and Villalta's

---

[3] At the inquest hearing held on April 7, 2021, Villalta testified, seemingly contrary to her Declaration, that her sessions with the therapist had been covered by insurance. Defense counsel, however, did not ask for what period of time such coverage lasted.

testimony at the inquest hearing, also reveal that even prior to Barkats' assault, Villalta experienced low self-esteem based on her parents' treatment of her as a "black sheep" and her father's abusive behavior toward her throughout her childhood.  (Dkt. 122-1 at 7.[4])

Villalta's condition continued to deteriorate.  As she had reported to her therapist, Villalta drank to excess, and felt overwhelmed looking for work.  (Urban Aff. Ex. A.)  She also could not focus on her studies and dropped out of her full-time degree program at Hunter College.  (Villalta Decl. ¶ 6.)

Villalta feared that she would be kidnapped by Barkats or someone acting on his behalf.   She became nervous in social settings and commonly asked a friend to accompany her home.  She could not sleep through the night and regularly awoke from nightmares.   She gained over thirty pounds due to stress eating.   She even started harming herself, cutting herself on three occasions during 2016 and experiencing suicidal thoughts.  Her hair thinned and she developed a bald spot, even though there is no history of alopecia in her family.  She still cannot sleep through the night, continues to experience self-doubt and shame surrounding what happened with Barkats, and is "plague[d]" with ongoing anxiety and depression.  (Villalta Decl. ¶¶ 17-21.)

E.    **Villalta's Employment Following Barkats' Treatment Of Her**

Although feeling overwhelmed and dropping out of Hunter College, Villalta enrolled in a part-time medical assistance specialist course and obtained certification as a medical assistant in June 2015.  (Villalta Decl. ¶ 6.)  Villalta has pursued employment ever since but has found it difficult to maintain employment, particularly for male bosses,

---

[4] Villalta initially filed redacted versions of her treatment notes.  At the request of the Court, Villalta filed unredacted copies on March 11, 2021.  (Dkt. 122-1.)

given her continuing distrust and fear of working for a male employer.  (Villalta Decl. ¶¶ 7-13.)

While working toward her certification, Villalta worked a few part-time minimum wage retail jobs, for which she earned a total of about $1,770.  In or about August 2015, Villalta began working for a doctor at Empire State Orthopedics at $12.00 an hour, 35 hours per week.  Feeling uncomfortable working for a male, however, Villalta resigned after three months.  (Villalta Decl. ¶ 7.)

Villalta looked for a job with a female doctor and succeeded in doing so.  In or around mid-January 2016, she started work for a female plastic surgeon at $14.00 per hour for 35 hours per week.  Feeling depressed and having low self-esteem, Villalta worked there until mid-April 2016.  (Villalta Decl. ¶ 8.)

In mid-June 2016, Villalta learned that she had become pregnant.  As a result, she "steeled [her]self for the sake of [her] unborn child and returned to work despite [her] ongoing emotional pain."  She found another job in June 2016, working for a doctor at Marmur Dermatology and Cardiology ("Marmur"), an all-female practice.  She earned $18 per hour for 40 hours per week.  (Villalta Decl. ¶ 9.)

In May 2018,[5] Villalta stopped working for Marmur.  Feeling overly concerned about her appearance and fearing that "if [she] looked a certain way or appear to meet a certain stereotype, other men like Barkats would more easily prey on [her] and [she] would be vulnerable to advances like the attack he made on [her]."  Villalta therefore left

---

[5] Villalta's Declaration indicates two different dates for when she stopped working for Marmur – April 20, 2018, and May 2018.  (*Compare* Villalta Decl. ¶ 9, *with* Villalta Decl. ¶ 10.)  At the inquest hearing, Villalta clarified that she gave notice on or about April 20, 2018, but no longer worked for Marmur as of early May 2018.

her job to undergo plastic surgery, specifically to have liposuction performed on her midsection.[6]  (Villalta Decl. ¶ 10.)

After recovery from the surgery, Villalta found work again in August 2018. Hopeful that she would be more comfortable working for a male at this point, Villalta accepted a job with a male doctor at $24 per hour, the first time she had worked for a male boss in over two years.  But she did not feel comfortable and left the job after two months on or about October 9, 2018.  After taking a short break, she tried again and worked for a male doctor beginning in November 2018 at $21.63 per hour.  She did not feel comfortable there either and left in January 2019.  (Villalta Decl. ¶ 11.)

Villalta then tried a third time working for a male doctor beginning in mid-January 2019 at $24 per hour for 40 hours per week.  She worked there until late July or early August 2019, when a female doctor previously affiliated with the Marmur medical practice offered to hire Villalta for the doctor's new practice at Entiere Dermatology. Although the job paid $22 per hour – $2 per hour less than what she had been earning – and was for 35 rather than 40 hours per week, Villalta felt she would be more comfortable working for a woman again and accepted the job.  (Villalta Decl. ¶ 12.)

In or around late January or early February 2020, Villalta began working at her most recent job for another female doctor at $30 per week for 40 hours per week.  Due to financial concerns arising from the COVID-19 pandemic, however, Villalta was let go from that practice on September 27, 2020.  (Villalta Decl. ¶ 13.)

Villalta has submitted a schedule of the dates she worked and pay she earned following her brief employment by JSB through October 31, 2018.  The schedule shows

---

[6] At the inquest hearing, Villalta provided more detail about her plastic surgery, explaining that it also included breast reduction.

that Villalta incurred $22,922.31 in lost wages as compared to what she would have earned if she had been employed by JSB at her starting salary over that four-year period.[7]  (Dkt. 124-1.)

## F.   Barkats' Treatment Of Other Female Employees And Prospective Employees

Villalta apparently was not Barkats' first victim.   Another woman, Neera Shivecharan, describes circumstances that are quite similar to those experienced by Villalta but which occurred approximately one year earlier.

Shivecharan met Barkats on the internet on October 13, 2013, by way of a dating website for persons who are married or in relationships.  (Shivecharan Aff. ¶ 3.)  In an exchange of text messages, Barkats informed Schivecharan that he was looking to hire a paralegal.  Shivecharan was searching for a full-time job in the legal field, so agreed to come in for an interview on October 15, 2013.  She informed Barkats, however, that she intended to keep the relationship professional.  (Shivecharan Aff. ¶ 5.)

Before the interview, Barkats sent several messages to Shivecharan stating that she would need to perform sexual favors for him in exchange for the job.  (Shivecharan Aff. ¶ 6.)   Shivecharan rejected those advances.   Barkats persisted, insisting that Shivecharan should come in to interview because Barkats is a powerful, successful attorney and that Barkats would be a good connection to have if she planned to attend law school.  Shivecharan was persuaded and came in for the interview.  (Shivecharan Aff. ¶ 7.)

---

[7] Villalta initially sought lost wages damages through September 27, 2020, when she was last employed.  After the inquest hearing, Villalta revised the end date to October 31, 2018.  The period following the revised date would not have added to Villalta's damages as she was receiving a higher salary than her JSB salary.

Barkats then proceeded almost exactly as he would a year later with Villalta. Barkats informed Shivecharan that part of the job would require having threesomes with him and another female.  He locked the door and told Shivecharan that if she wanted the formal interview for the job, she first would have to have sex with Barkats.  Barkats said that if Shivecharan did what he asked, he would offer her the full-time paralegal position for $30,000 per year plus medical benefits.  Shivecharan told Barkats that "this did not sound like the job for me."  At first acting like he was going to push Shivecharan out the door, Barkats covered her mouth with his hand, told her to keep her mouth shut, bent her over a desk, lifted her skirt, had sexual intercourse with her, and at the end told her to keep her mouth shut.  (Shivecharan Aff. ¶ 9.)  Barkats then offered Shivecharan the paralegal position, told her that she would have to get tested for sexually transmitted diseases to start the job, and had Shivecharan meet with another woman for a formal interview for the position.  (Shivecharan Aff. ¶ 10.)

After Shivecharan left the JSB office, Barkats engaged her in a text conversation. Barkats told Shivecharan that her formal interview did not go well because she did not type fast enough and was not certified as a paralegal.  Barkats said that he could still get Shivecharan the job but only at a salary of $25,000, not $30,000.   The two exchanged further messages about the interview and the job through October 24, 2013, culminating in Barkats' calling Shivecharan a "cunt," "slut," and "whore" among other things.   On November 1, 2013, Barkats texted Shivecharan, the only word being "Horny?"  (Shivecharan Aff. Ex. D.)   Shivecharan did not respond and has not spoken or texted with Barkats since October 24, 2013.  (Shivecharan Aff. ¶ 12 and Ex. D.)

11

According to Stacey Spinelli, a former officer manager who worked at JSB starting on April 29, 2013, Barkats belittled female employees and made inappropriate comments to female staff members on the basis of their sex.  Spinelli witnessed such conduct the first day she started.  (Spinelli Aff. ¶¶ 7-8.)  For instance, Spinelli witnessed Barkats informing female employees that he did not like what they wore to work and that they looked "messy" or overweight.  Barkats told Spinelli directly that he did not feel the women at the office dressed to his standards and that he intended to have stewardess uniforms made for the female staff members.   (Spinelli Aff. ¶ 9.)   Barkats also commented that female employees should be "obedient" and berated and threatened female employees if they did not act "obediently."  (Spinelli Aff. ¶¶ 10-11.)  On multiple occasions, women told Spinelli that Barkats made rude comments about them and that they feared him but desperately needed their jobs for financial reasons.  (Spinelli Aff. ¶ 14.)

When, less than a month into her job, Spinelli confronted Barkats about his conduct and cutting pay from employees' checks, Barkats swore at her, threatened to cut her pay, and ultimately told her to "go the fuck home, nobody needs you."  That was Spinelli's last day of work at JSB.  (Spinelli Aff. ¶¶ 15-16.)

**Procedural History**

The procedural history of the case is significant in light of Defendants' obstruction and vexatious litigation tactics.  Barkats impeded matters all the more by fleeing the country, apparently to elude his arrest for criminal indictment in New York.[8]

---

[8] *See* Letter of Michael R. Minkoff, dated July 10, 2019, Dkt. 78, at 1 ("[Defendants' counsel] represented that Defendant Barkats remains out of the United States with no known plans to return"); Letter of Michele A. Baptiste, dated July 22, 2019, Dkt. 80, at 1

Villalta commenced the action on April 13, 2016.[9]  (Dkt. 1.)  Due to an arbitration provision in Villalta's employment agreement, the parties entered into a stipulation to stay the case pending arbitration.  (Dkt. 14.)  Barkats defaulted, however, failing to participate in the arbitration.  At Villalta's request, the Court lifted the stay.  (Dkt. 33.)  Barkats then moved for reconsideration, which the Court denied.  (Dkt. 43.)  Barkats appealed the Court's order lifting the stay and sought a stay pending the appeal.  (Dkt. 45.)  This Court, to which the case was referred for general pretrial purposes (Dkt. 52), denied that motion (Dkt. 53).  Ultimately, the Second Circuit dismissed Barkats' appeal on December 6, 2018, for his failure to prosecute.  *Villalta v. JS Barkats PLLC*, No. 18-2530, Dkt. 42.

In December 2018, Barkats' then-current counsel withdrew based on Barkats' failure to pay fees and failure to communicate with his attorney.  (Dkt. 56.)  That event resulted in further delay, as Barkats received time to either obtain new counsel or appear pro se.  (Dkt. 56.)  After Barkats' replacement counsel appeared in January 2019 (Dkt. 66), this Court entered a case management plan and scheduling order that set October 31, 2019, as the deadline for completing fact discovery (Dkt. 76).  Barkats

---

("As the Court is aware, my client remains out of the United States.  Following the court conference in May 2019, I reached out to Mr. Barkats' criminal attorney … and was advised that he was working diligently to negotiate with the New York County District Attorney's Office to secure the Defendant's return to the United States.  As of today's date, I was advised that the negotiations have been unsuccessful.").  *See also Lewis Family Group Fund, LP v. JS Barkats PLLC*, No. 16-CV-5255 (S.D.N.Y.), Letter from Simon Schwarz, dated December 6, 2018, Dkt. 201, at 1-2 (describing Barkats as "being a fugitive from the law" from "his overseas hideout" and "on the lam" while evading New York County grand jury indictment for grand larceny).

[9] Villalta exhausted her administrative remedies by filing a charge of discrimination with the United States Equal Employment Opportunity Commission on March 9, 2015, resulting in issuance of a notice of the right to sue on January 21, 2016.  (Compl. ¶¶ 5-6.)

then proceeded to resist discovery, failing to answer interrogatories and requests to admit, necessitating Villalta to file a motion to compel (Dkt. 78), which this Court granted (Dkt. 81).

Barkats next avoided setting a date for his deposition and insisted that if there were to be a deposition, it take place by remote means while he remained outside the United States.  (Dkts. 83, 85.)  Villalta thus needed to file another motion to compel, which this Court granted on October 1, 2019.  (Dkt. 86.)  In granting the motion, this Court explained that "requiring the deposition to proceed by remote means would materially prejudice Plaintiff" and that it "would be manifestly unfair and a perversion of justice to permit Barkats from using the excuse that he has fled criminal indictment as a basis to avoid having his deposition taken in person."  (Dkt. 86 at 1-2.)  The order thus directed Barkats to appear in person in New York for his deposition no later than November 30, 2019 – which required extending the discovery schedule – and warned: "If Barkats fails to appear for his deposition as scheduled, the Court will recommend to the District Judge that default judgment be entered against Defendants."  (Dkt. 86 at 2.)

Barkats did not appear for his deposition; nor did he request any extension of time or relief from the October 1, 2019 order.  To the contrary, on November 13, 2019, his attorney informed Villalta's counsel that "[m]y client has advised that he will not be available for a deposition within the SDNY by the date set by the Court" and did not offer any alternative timing or suggest that Barkats would ever be available for deposition in New York.  (Dkt. 87-1.)  That same day, Barkats offered to resolve the case for a sum of money, and a much larger sum of money if Villalta testified that she was wrong and had been misled by her lawyers.  (Dkt. 87-2.)  November 13, 2019, also

was the day that Barkats sent his texts to Villalta threatening he would produce and post on social media a video exposing Villalta sexually but also offering her "big bucks" if she testified as he wished.  (Villalta Decl. ¶ 15 and Ex. B.)

On January 3, 2020, this Court gave Barkats one last opportunity to respond, and warned that, absent a response, the Court will recommend entry of default judgment. (Dkt. 89.)  Barkats did not file any response.  Accordingly, on February 3, 2020, this Court recommended entering default judgment against Barkats due to his dilatory tactics, failure to participate in discovery, disregard of court orders, and his bad faith, malicious conduct as exemplified by his offer to purchase Villalta's testimony while at the same time threatening to defame and shame her on the internet.  (Dkt. 90.)

In that report and recommendation, the Court noted that Barkats had recently engaged in virtually identical behavior in another case in this District resulting in dispositive sanctions.  (Dkt. 90 at 7.)  In that case, as here, Barkats "'engaged in a sustained campaign of delay tactics,' defied court orders, and remained situated abroad with no indication of when or if he would return for trial."  (Dkt. 90 at 7.)  *See Family Lewis Group Fund LP v. JS Barkats PLLC*, No. 16-CV-5255 (S.D.N.Y.), Dkt. 249 at 3, Dkt. 252 at 2.  On July 11, 2019, the Honorable Allison J. Nathan, U.S.D.J., struck Barkats' answer, defenses, and counterclaims and found Barkats in default.  (No. 16-CV-5255, Dkt. 252 at 5.)

On July 14, 2020, the Honorable Ronnie Abrams, U.S.D.J., adopted this Court's report and recommendation in its entirety and referred the matter to this Court for an inquest to determine damages.  (Dkt. 93.)  This Court then issued an order directing Plaintiff to submit proposed findings of fact and conclusions of law, along with

supporting materials, and providing Defendants with an opportunity to respond.  (Dkt. 95.)  After multiple extensions, Villalta filed her inquest materials on December 3, 2020. (Dkts. 104, 111-115.)  On January 26, 2020, Barkats filed a short opposition brief with no supporting affidavits or other documents.  (Dkt. 120.)  The Court held an inquest hearing on April 7, 2021, at which Villalta testified and defense counsel appeared to cross-examine.  At the request of the Court, Villalta filed revised damages information shortly following the inquest hearing.  (Dkt. 124.)

### Legal Standards

When a defendant defaults, all the facts alleged in the complaint, except those relating to the amount of damages, must be accepted as true.  *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011); *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (trial court is required to "accept all of [the plaintiff's] factual allegations as true and draw all reasonable inferences in its favor").  "This principle applies regardless of whether default is entered as a discovery sanction or for failure to defend."  *Walpert v. Jaffrey*, 127 F. Supp. 3d 105, 129 (S.D.N.Y. 2015) (internal quotation marks omitted).  The court may also rely on factual allegations pertaining to liability contained in affidavits and declarations submitted by the plaintiff.  *See, e.g.*, *Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 54 (2d Cir. 1993); *Fustok v. ContiCommodity Services, Inc.*, 873 F.2d 38, 40 (2d Cir. 1989).  Nonetheless, the court "must still satisfy itself that the plaintiff has established a sound legal basis upon which liability may be imposed."  *Shld, LLC v. Hall*, No. 15-CV-6225, 2017 WL 1428864, at *3 (S.D.N.Y. April 20, 2017) (internal quotation marks omitted); *see Finkel*, 577 F.3d at 84.

16

Once liability has been established, a plaintiff must provide admissible evidence establishing the amount of damages with reasonable certainty.  *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Division of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997);  *see also Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012) (in an inquest following a default, "[a] plaintiff must . . . substantiate a claim with evidence to prove the extent of damages").  To assess whether the plaintiff has articulated a sufficient basis for damages, a court has the discretion, but is not required, to hold a hearing.  *See* Fed. R. Civ. P. 55(b)(2); *Fustok*, 873 F.2d at 40.  An inquest into damages may be conducted "on the papers," without an evidentiary hearing where there is a sufficient basis on which to make a calculation.  *See Tamarin v. Adam Caterers, Inc.*, 13 F.3d 51, 53-54 (2d Cir. 1993); *Maldonado v. La Nueva Rampa, Inc.*, No. 10-CV-8195, 2012 WL 1669341, at *2 (S.D.N.Y. May 14, 2012).  Here, the Court held a hearing, particularly to address a few seeming inconsistencies related to calculating lost wages, to inquire about Villalta's emotional distress, and generally to assess her credibility.[10]

### Liability

Accepting the allegations of Villalta's complaint as true, and supplemented by the affidavits and declarations of record, Villalta has established JSB's liability for sex discrimination under Title VII, and both Defendants' liability for gender discrimination under the NYCHRL.

---

[10] The Court found Villalta to be credible overall.  The inconsistencies related to lost wages calculations were attributable to counsel, not Ms. Villalta.  The Court asked for and received a revised damages chart and calculation.  (Dkt. 124-1.)

A.      **Title VII Violation**

Under Title VII, it is unlawful for "an employer … to discriminate against any [employee] with respect to … sex."  42 U.S.C. § 2000e-2(a)(1).  "[T]he kinds of workplace conduct that may be actionable under Title VII … include '[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.'"  *Redd v. New York State Division of Parole*, 678 F.3d 166, 175 (2d Cir. 2012) (alterations and omission in original) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 2404 (1986)).  Sexual harassment in the workplace violates Title VII's prohibition against sex discrimination when it fits into either of two paradigms: hostile work environment or *quid pro quo* sexual harassment. *Pelgrift v. 335 W. 41st Tavern Inc.*, No. 14-CV-8934, 2017 WL 4712482, at *10 (S.D.N.Y. Sept. 28, 2017).  Villalta's allegations establish both.

The hostile work environment paradigm of sexual harassment under Title VII requires a plaintiff to establish both "objective and subjective elements: the misconduct shown must be 'severe or pervasive enough to create an objectively hostile or abusive work environment,' and the victim must also subjectively perceive that environment to be abusive."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Harris v. Forklift Systems*, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)).  Among the factors courts consider are "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance."  *Harris*, 510 U.S. at 23, 114 S. Ct. at 371.

18

"As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Alfano*, 294 F.3d at 374 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). "However, a single act can create a hostile work environment if it in fact works a transformation of the plaintiff's workplace." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (internal quotation marks and brackets omitted). "While the standard for establishing a hostile work environment is high," the Second Circuit has "repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Id.* (internal quotation marks and brackets omitted).

An entity employer, such as JSB, may be held vicariously liable for a hostile environment created by a supervisor, such as Barkats, defined as anyone "'empowered by the employer to take tangible employment actions against the victim.'" *Hernandez v. Premium Merchant Funding One, LLC*, No. 19-CV-1727, 2020 WL 3962108, at *12 (S.D.N.Y. July 13, 2020) (quoting *Vance v. Ball State University*, 570 U.S. 421, 450, 133 S. Ct. 2434, 2454 (2013)); *see also Pelgrift*, 2017 WL 4712842 at *10 ("A corporation can be held vicariously liable for a hostile environment created by a supervisor with authority over the employee where the harassment results in a tangible undesirable employment action, such as discharge or demotion").

The second paradigm, *quid pro quo* sexual harassment, "refers to situations in which 'submission to or rejection of [unwelcome sexual] conduct by an individual is used

19

as the basis for employment decisions affecting such individual ….  It is enough to show that the supervisor used the employee's acceptance or rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the employee's job.'"  *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1154-55 (E.D.N.Y. 2003) (alteration in original) (quoting *Karibian v. Columbia University*, 14 F.3d 773, 777-78 (2d Cir. 1994)).  Employers are strictly liable for *quid pro quo* harassment committed by supervisors.  *Vance*, 570 U.S. at 424, 133 S. Ct. at 2439; *Perks*, 251 F. Supp. 2d at 1155 (citing earlier Supreme Court cases).

The requirements of both paradigms are easily met here.  It is difficult to imagine a more "severe or pervasive" form of harassment than that described in Plaintiff's allegations, or a more prototypical example of *quid pro quo*.  Barkats, the managing partner of JSB, regularly denigrated female employees, as set forth by former office manager Spinelli, and coerced sex for employment, as he did with both Shivecharan and Villalta.  With respect to Villalta specifically, Barkats interviewed her while forcing her to strip completely naked to display her "obedience" to him, and coerced her to perform oral sex and engage in sexual intercourse as a precondition to receiving a job offer.  On Villalta's first day at work, Barkats again coerced Villalta into having sex with him, choked and threatened her, and directed her to get tested for sexually transmitted diseases as a condition for continuing her job.  And, when Villalta stopped working for Defendants, Barkats continued to harass her through text messages and social media, threatening to expose her sexually on the internet.  Although it should go without saying, Villalta perceived Barkats' actions as abusive.

20

Villalta also has established a claim of constructive discharge by virtue of Barkats' conduct. A constructive discharge claim requires a plaintiff to show that her employer "rather than discharging [her] directly, intentionally create[d] a work atmosphere so intolerable that [she was] forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151-52 (2d Cir. 2003). The inquiry is an objective one examining whether working conditions "bec[a]me so intolerable that a reasonable person in [the plaintiff's] position would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 2351 (2004). "Constructive discharge claims face a 'demanding' standard, *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010) (summary order), 'even higher than that required to prevail on a hostile environment claim,' *Mandel v. Champion International Corp.*, 361 F. Supp. 2d 310, 327 (S.D.N.Y. 2005)." *Pryor v. Jaffe & Asher, LLP*, 992 F. Supp. 2d 252, 262 (S.D.N.Y. 2014). Villalata, however, unquestionably has met that standard here, having demonstrated conduct by her employer that far exceeds other transgressions that have been sufficient to establish constructive discharge. *See, e.g.*, *Munson v. Diamond*, No. 15-CV-425, 2017 WL 4863096, at *3, *5 (S.D.N.Y. June 1, 2017), (holding that supervisor's multiple sexual propositions and improper touching were "sufficient to make out a hostile environment-constructive discharge claim"), *R. & R. adopted*, 2017 WL 4862789 (S.D.N.Y. Oct. 26, 2017); *Pryor*, 992 F. Supp. 2d at 261-62 (finding allegation that plaintiff "felt obliged to resign" after supervisor "subjected her to sexual advances and made several forcible attempts to kiss her" was sufficient to state a claim for constructive discharge).

Because Barkats is the owner, founder, and managing partner of JSB, JSB is vicariously liable for Barkats' *quid pro quo* harassment and creation of a hostile work environment.  *Pelgrift*, 2017 WL 4712482, at *6 (citing *Redd*, 678 F.3d at 182).  And having defaulted, JSB is unable to meet its burden to establish an affirmative defense.  *See Martinez v. Alimentos Saludables Corp.*, No. 16-CV-1997, 2017 WL 5033650, at *8 n.6 (E.D.N.Y. Sept. 22, 2017) ("Since defendants have defaulted, they have not availed themselves of any of the affirmative defenses provided by statute").  Defendant JSB is therefore liable to Villalta for sex discrimination in violation of Title VII.

## B.     NYCHRL Violation

Villalta also has established gender discrimination claims under the NYCHRL, which applies as she worked for Defendants in Manhattan.

"[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims."  *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  Under the NYCHRL, discrimination claims are construed liberally in favor of plaintiffs to the extent that such a construction is reasonably possible.  *MacAlister v. Millenium Hotels & Resorts*, No. 17-CV-6189, 2018 WL 5886440, at *8 (S.D.N.Y. Nov. 8, 2018) (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 477-78, 922 N.Y.S.2d 244, 246 (2011)).  That is, "unlike the federal statutes and the NYSHRL, 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.'"  *Id.* (quoting *Mihalik*, 715 F.3d at 114).

While the NYCHRL does not serve as a "general civility code," a showing that "'the plaintiff was treated less well because of a discriminatory intent' would suffice."  *Id.* (quoting *Workneh v. Super Shuttle International, Inc.*, No. 15-CV-3521, 2016 WL

5793744, at *9 (S.D.N.Y. Sept. 30, 2016)).  Villalta has amply alleged that she was "treated less well" than her male counterparts as her job offer and continued employment were conditioned upon acquiescing to Barkats' sexual assault.  Villalta therefore has met her burden in establishing a *prima facie* case of NYCHRL gender discrimination.

The NYCHRL does not distinguish *quid pro quo* claims from hostile work environment ones, focusing instead on "unequal treatment based on gender."  *Setty v. Fitness*, No. 17-CV-6504, 2018 WL 8415414, at *8 (E.D.N.Y. Dec. 18, 2018) (citing *Mihalik*, 715 F.3d at 114), *R. & R. adopted sub nom. Setty v. Synergy Fitness*, 2019 WL 1292431 (E.D.N.Y. March 21, 2019).  Nonetheless, a *quid pro quo* claim is actionable under the NYCHRL as long as the plaintiff has received unequal treatment based on her gender.  *Mihalik*, 715 F.3d at 114.

Unlike Title VII, NYCHRL provides for individual liability.  *See Pelgrift*, 2017 WL 4712482 at *13 (citing *Rodriguez v. Express World Wide, LLC*, No. 12-CV-4572, 2014 WL 1347369, at *4 (E.D.N.Y. Jan. 16, 2014)); *see generally* N.Y.C. Admin Code §§ 8-102 (defining "employer" broadly to include natural persons) and 8-107(1)(a) (defining "unlawful discriminatory practice" as actionable against "any employer or an employee or agent thereof").  Individuals may be liable under the NYCHRL for discrimination regardless of possessing any decision-making power; they need only "'participate in the conduct giving rise to a discrimination claim.'"  *Green v. N.Y.C. Transit Authority*, No. 15-CV-8204, 2020 WL 5632743, at *11 (S.D.N.Y. Sept. 21, 2020) (quoting *Feingold*, 366 F.3d at 158-59).  Here, Barkats directly participated in the conduct giving rise to

Villalta's claims.  As such, Barkats is directly and individually liable.  Accordingly, both Defendants are jointly and severally liable for violating the NYCHRL.

### Damages

Villalta seeks an award consisting of three types of damages: economic, emotional distress, and punitive.  She is entitled to all three.

"Under Title VII, victims of employment discrimination are entitled to reasonable damages that would make the plaintiff whole for injuries suffered on account of unlawful employment discrimination."  *Munson*, 2017 WL 4863096 at *7 (internal quotation marks and brackets omitted).  Such damages may include compensation for economic loss and for pain and suffering, and are also available under the NYCHRL.  *Id.*; *see also Moore v. Houliahan's Restaurant*, No. 07-CV-3129, 2011 WL 2470023, at *4 (E.D.N.Y. May 10, 2011) ("Title VII … and [the] NYCHRL entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering").

Title VII places a sliding cap on non-economic compensatory and punitive damages based on employer size, with the lowest damages amount capped at $50,000 for employers of between fifteen and 100 employees, ranging upward to $300,000 for employers with 500 or more employees.  42 U.S.C. § 1981a(b)(3).  While Title VII limits the amount of damages that can be awarded, the NYCHRL does not; as a result, courts allocate damages exceeding Title VII's cap to the NYCHRL when pleaded simultaneously.  *See Gutierrez v. Taxi Club Management, Inc.*, No. 17-CV-0532, 2018 WL 3432786, at *6, *10 (E.D.N.Y. June 25, 2018) (collecting cases and awarding non-economic compensatory and punitive damages exceeding Title VII cap under the NYCHRL), *R. & R. adopted*, 2018 WL 3429903 (E.D.N.Y. July 16, 2018).

A.    **Economic Damages**

A victim of employment discrimination is entitled to reasonable damages to make her "'whole for injuries suffered on account of unlawful employment discrimination.'" *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998) (quoting *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S. Ct. 2362, 2372 (1975)).  Two forms of economic damage are back pay (what is owed for the past) and front pay (what is owed for the future).  Villalta does not seek front pay.  Rather, she seeks only back pay with interest.

1.    **Back Pay**

"'Back pay is a specific remedy for unlawful discrimination under Title VII,' and is also available … under the NYCHRL." *Garcia v. Comprehensive Center, LLC*, No. 17-CV-8970, 2019 WL 8274296, at *5 (S.D.N.Y. Nov. 21, 2019) (quoting *Najnin v. Dollar Mountain, Inc.*, No. 14-CV-5758, 2015 WL 6125436, at *2 (S.D.N.Y. Sept. 25, 2015)); *see* 42 U.S.C. § 2000e-5(g)(1).  Although, within their discretion, courts generally award back pay in employment discrimination cases absent special circumstances.  *See Carrero v. New York City Housing Authority*, 890 F.2d 569, 580 (2d Cir. 1989) ("An award of back pay is the rule, not the exception").

Back pay is generally calculated as "'an amount equal to the wages the employee would have earned from the date of discharge to the date of reinstatement.'" *Noel v. New York State Office of Mental Health Central New York Psychiatric Center*, 697 F.3d 209, 213 (2d Cir. 2012) (quoting *United States v. Burke*, 504 U.S. 229, 239, 112 S. Ct. 1867, 1873 (1992)).  "Where, as here, reinstatement is not requested (or not possible), the plaintiff's entitlement to back pay is generally reduced or eliminated when

25

she obtains, or could have obtained, paid employment elsewhere." *Munson*, 2017 WL 4863096 at *7; *see* 42 U.S.C. § 2000e-5(g)(1) ("Interim earnings or amounts earnable with reasonable diligence … shall operate to reduce the back pay otherwise allowable"). "The same standards used to award … back pay in Title VII discrimination cases also apply to cases arising under … [the] NYCHRL." *Becerril v. East Bronx NAACP Child Development Center*, No. 08-CV-10283, 2009 WL 2611950, at *3 (S.D.N.Y. Aug. 18, 2009) (citing *Shannon v. Fireman's Fund Insurance Co.*, 136 F. Supp. 2d 225, 228 n.4 (S.D.N.Y. 2001)), *R. & R. adopted*, 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009).

A plaintiff cannot stand idly by once she has left her employer.  Rather, she "has the duty to exercise reasonable diligence in mitigating damages by seeking alternative employment." *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1182 (2d Cir. 1996).  "This obligation," however, "is not an onerous one, and there is no requirement that a plaintiff be successful in obtaining comparable work, only that … she make[ ] a good faith effort to do so." *Nanjin*, 2015 WL 6125436 at *2; *accord Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997).  To satisfy the duty to mitigate, the plaintiff "need not go into another line of work, accept a demotion, or take a demeaning position." *Ford Motor Co. v. Equal Employment Opportunity Commission*, 458 U.S. 219, 231, 102 S. Ct. 3057, 3065 (1982).  However, if the plaintiff accepts employment, even if not comparable, the new earnings are subtracted from the back pay award.  *See* 42 U.S.C. § 2000e-5(g)(1).

Here, as explained by Villalta and confirmed in her therapist's treatment notes, Villalta experienced ongoing trauma and emotional suffering attributed to Barkats' assault and harassment.  Villalta dropped out of college and was in and out of jobs following her ordeal with Barkats.  She persisted, however, both obtaining certification

as a medical assistant, and repeatedly looking for and finding jobs after previous ones came to an end and she struggled with low self-esteem, anxiety, depression, and suicidal thoughts.  Some of the jobs Villalta was able to secure paid more than she would have earned on a weekly basis at JSB.  But mostly they did not.

The Court finds that Villalta fulfilled her obligation to mitigate damages and that she should not be penalized for obtaining jobs that paid less than what JSB had paid, for leaving jobs because of her emotional trauma and distrust of male bosses, or for the limited periods of unemployment between jobs.  *See Bergerson v. New York State Office of Mental Health, Central New York Psychiatric Center*, 526 F. App'x 109, 111 (2d Cir. 2013) ("a voluntary quit does not toll the back pay period when it is motivated by unreasonable working conditions or an earnest search for better employment" (internal quotation marks omitted)); *Kamiel v. Hai Street Kitchen & Co, LLC*, No. 19-CV-5336, 2020 WL 1916534, at *4 (S.D.N.Y. March 17, 2020) (though at a lower salary, "Plaintiff properly mitigated her damages by finding new employment after 20 weeks"), *R. & R. adopted*, 2020 WL 1911193 (S.D.N.Y. April 20, 2020); *Warnke v. CVS Corp.*, 265 F.R.D. 64, 67 (E.D.N.Y. 2010) (describing, in general, the "lowered sights doctrine," wherein a plaintiff is required to lower her sights in order to mitigate her losses, and an employer who is liable under Title VII bears the burden of showing that, notwithstanding this rule, the plaintiff failed to mitigate).

As set forth in the statement of facts, Villalta's lost wages are calculated to be $22,922.31.  (Dkt. 124-1.)  Villalta is entitled to a back pay award in that amount.

2.    **Pre-Judgment Interest**

Both Title VII and the NYCHRL authorize courts to award pre-judgment interest on back pay awards. *Setty*, 2018 WL 8415414 at *18. An award of pre-judgment interest on a plaintiff's back pay award is appropriate "'because it serves to compensate the plaintiff for loss of the use of money wrongfully withheld [because of defendants' discrimination].'" *Rodriguez*, 2014 WL 1347369 at *7 (alteration in original) (quoting *Thomas v. iStar Financial Inc.*, 508 F. Supp. 2d 252, 264 (S.D.N.Y. 2007)). Consequently, to the extent that damages awarded to the plaintiff represent compensation for lost wages, "it is ordinarily an abuse of discretion ***not*** to include pre-judgment interest." *Id.* (emphasis added) (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 873 (2d Cir. 1998)).

When calculating pre-judgment interest on discrimination claims "based on violations of both federal and state law, courts in this circuit uniformly have applied a federal interest rate, most commonly based on the average rate of return on one-year Treasury bills … for the relevant time period." *Id.* (citing *Thomas*, 508 F. Supp. 2d at 264). As Villalta's claim arose under both federal and local New York City laws, the appropriate rate of interest "is the federal interest rate based on the average rate of return on one-year Treasury bills for the relevant time period between the time the claim [arose in this case] until the entry of judgment pursuant to 28 U.S.C. § 1961(a)." *Id.* (alteration in original) (citing *Thomas*, 508 F. Supp. 2d at 264) (in turn citing *Levy v. Powell*, No. 00-CV-4499, 2005 WL 1719972, at *3 (E.D.N.Y. July 22, 2005)). Interest should then be compounded annually. *Id.* at *7 n.6 (citing *Joseph v. HDMJ Restaurant, Inc.*, No. 09-CV-240, 2013 WL 4811225, at *15 (E.D.N.Y. Sept. 9, 2013)).

Plaintiff's counsel has provided the average one-year Treasury bills rate from October 31, 2014, through October 31, 2018, based on daily changes to the same. (Dkts. 124 at 1-2, 124-2.)   That figure is 1.014%.  (Dkt. 124-1.)  Compounded interest for the relevant period is $1,430.54.[11]  Accordingly, the total back pay that should be awarded, inclusive of pre-judgment interest, is $24,352.85.[12]

## B.   Emotional Distress Damages

Compensatory damages may also include damages for emotional harm. Although "[a]wards for mental and emotional distress are inherently speculative … a legal system [nevertheless] has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate."  *Ravina v. Columbia University*, No. 16-CV-2137, 2019 WL 1450449, at *11 (S.D.N.Y. March 31, 2019) (Abrams, J.) (alterations and omission in original) (quoting *Stampf v. Long Island Railroad Co.*, 761 F.3d 192, 205 (2d Cir. 2014)).   The Second Circuit recognizes three categories of damages for emotional distress: (1) garden variety; (2) significant; and (3) egregious. *Sooroojballie v. Port Authority of New York & New Jersey*, 816 F. App'x 536, 546 (2d Cir. 2020).

"Garden-variety" claims are those in which "'the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms.'"   *Ravina*, 2019 WL 1450449 at *11 (quoting *Emamian v. Rockefeller University*, No. 07-CV-3919, 2018 WL 2849700, at *16 (S.D.N.Y. June 8,

---

[11] Villalta appropriately used a mid-point date of October 30, 2016, for calculation of the interest total.

[12] The revised damages schedule calculation of the total amount of lost wages plus interest is off by one cent, likely due to rounding differences.  (Dkt. 124-1.)

2018)).    Relatively recent decisions describe such claims as "'generally merit[ing] $30,000 to $125,000 awards.'"  *Id.* (alteration in original) (quoting *Emamian*, 2018 WL 2849700 at *16; and then citing, *e.g.*, *Duarte v. St. Barnabas Hospital*, 341 F. Supp. 3d 306, 321-22 (S.D.N.Y. 2018) (granting a remittitur of a compensatory damages award from $624,000 to $125,000 where the "[p]laintiff's vague and subjective complaints of insomnia, lower self-esteem, depression, anxiety, and stomach aches and headaches – unsupported by medical corroboration – establish[ed] no more than 'garden-variety' emotional distress") (alterations in original)).

"Significant" emotional distress claims "'are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses.'"  *Ravina*, 2019 WL 1450449 at *11 (quoting *Emamian*, 2018 WL 2849700 at *16; *Duarte*, 341 F. Supp. 3d at 320).    These "significant" claims "typically support damages awards ranging from $50,000 to $200,000, though greater awards may be appropriate under some circumstances."  *Id.* (citing, *e.g.*, *Lore v. City of Syracuse*, 670 F.3d 127, 177-180 (2d Cir. 2012) (upholding "significant" compensatory damages award of $250,000 for reputational harm and emotional distress where evidence included evidence of medical treatment as well as testimony from the plaintiff and her mother that she suffered from "tension headaches, abdominal pain, insomnia, anxiety, and depression")); *see also Sooroojballie*, 816 F. App'x at 546 ("In cases with 'significant' emotional distress claims, awards usually range from $50,000.00 to $200,000.00, but [c]ourts have, in some instances, upheld awards exceeding $200,000.00" (alteration in original) (internal quotation marks omitted));

*Emamian*, 2018 WL 2849700 at *17 (granting remittitur of an emotional distress award from $2,000,000 to $200,000 under the NYCHRL where evidence consisted of "[p]laintiff's own testimony regarding her mental state, her trichotillomania and physical manifestations of her emotional suffering," as well as "corroborative medical testimony" (alteration in original)); *Gutierrez*, 2018 WL 3432786 at *10 (awarding $130,000 in emotional distress damages under the New York State Human Rights Law and the NYCHRL where plaintiff testified that she "cried at work, had migraine headaches, routinely felt nauseous, vomited, had trouble sleeping, suffered from stress and anxiety, overate, and felt a general sensation of helplessness"); *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 328-34 (S.D.N.Y. 2016) (granting a remittitur of a $500,000 compensatory damages award on a sexual harassment claim under the NYCHRL to $150,000 where there was evidence of "significant" sexual harassment, but the evidence of emotional distress was limited to plaintiff's testimony).

Lastly, "'egregious emotional distress claims generally involve either outrageous or shocking discriminatory conduct or a significant impact on the physical health of the plaintiff.'" *Ravina*, 2019 WL 1450449 at *12 (quoting *MacMillan v. Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012)). Awards for "egregious" claims "can far exceed $200,000, with awards of over $1 million reserved for the most egregious cases." *Id.* (citing *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014) (upholding an award of $1.32 million in compensatory damages for a "unique" case under Title VII, the New York State Human Rights Law, and a common law tort claim for intentional infliction of emotional distress, involving "extreme racial harassment in the

workplace," while "acknowledg[ing] that the jury's compensatory award tests the boundaries of proportionality and predictability") (alteration in original)).

"Important factors in assessing an appropriate amount to award for emotional suffering include 'the amount, duration, and consequences of [the claimant's] emotional distress.'" *Jowers v. DME Interactive Holdings, Inc.*, No. 00-CV-4753, 2006 WL 1408671, at *12 (S.D.N.Y. May 22, 2016) (alteration in original) (quoting *Kuper v. Empire Blue Cross & Blue Shield*, No. 99-CV-1190, 2003 WL 359462, at *14 (S.D.N.Y. Feb. 18, 2003)); *see Sooroojballie*, 816 F. App'x at 547-48 (observing that plaintiff's evidence did not contain "prolonged mental harm or negative, long-term prognosis that is typically present in cases with awards around $500,000," and ordering remittitur of $2.16 million jury award for emotional distress to $250,000).

Here, the Court has no difficulty in concluding that an award of "egregious" emotional harm damages is appropriate.  To recap: Barkats twice sexually assaulted Villalta in the workplace, coercing her into performing oral sex and engaging in sexual intercourse – once as a condition for her to obtain her job, and a second time on her first day of work to demonstrate what would continue to be expected of Villalta if she wanted to keep her job.  Barkats choked Villalta and told her that she belonged to him. These physical assaults were followed by ongoing harassment carried out through text messages and social media posts, including Barkats' threat to disseminate revenge porn depicting Villalta and his multiple attempts to purchase Villalta's testimony.  (Villalta Decl. ¶ 15 and Ex. B.)

Villalta's emotional trauma was severe and long, persisting to the present, even after more than six years since the physical assaults.  Villalta treated with a therapist,

albeit sporadically and for a brief period less than half a year, who confirmed that she suffered from paranoia, anxiety, depression, and alcoholic episodes when attempting to cope with Barkats' assault and abuse.  (Urban Decl. Ex. A at 1, 2, 4.)  She had trouble maintaining employment, particularly due to her fear of working for a male superior. Villalta resorted to self-harm, thrice cutting herself, and experienced suicidal ideations after feeling as though all hope was lost.  (Villalta Decl. ¶¶ 7, 11-12, 19.)  She ate to relieve stress, gained over thirty pounds, and then underwent surgery to remove that weight in attempting to mentally recover and repair her self-worth.  (Villalta Decl. ¶¶ 10, 18-19.)  In short, Villalta has suffered extensive and ongoing mental and physical harm.

Of course there are limits to, and limited evidence of, what Villalta has experienced.  She does not claim to have attempted suicide.  She did not go for in-patient treatment at any facility, and she only treated with a therapist for a short time. She does not purport to be taking any medications, although she did resort to self-medication through alcohol and other destructive behavior.  Villalta did not submit a diagnosis or opinion from a mental health professional of any severe chronic condition, such as post-traumatic stress syndrome ("PTSD").  Under these circumstances, an emotional distress award of $1 million is excessive.

Indeed, cases with relatively similar combinations of egregious conduct, harm inflicted, and level of corroboration have yielded emotional distress awards of far more modest amounts.  *See*, *e.g.*, *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 78-79, 99-100 (E.D.N.Y. 2020) (finding that emotional distress award of $200,000 "strikes a proper balance between the traumatic abuse plaintiff suffered and the near-complete absence of corroborating evidence" where defendant employer, who defaulted, made

repeated sexual advances, coerced plaintiff into having sex, withheld pay in retaliation for plaintiff's request to maintain professional relationship, and ultimately threw plaintiff against a wall, choked her, and told her never to come back); *Garcia*, 2019 WL 8274296 at *8 (awarding $175,000 in emotional distress damages to plaintiff who "suffered physical violence, harassment, and discrimination for more than a year, leading to psychological treatment" including therapy and medication for diagnoses of PTSD and major depressive disorder), *R. & R. adopted*, 2020 WL 1435002 (S.D.N.Y. March 24, 2020); *Gutierrez*, 2018 WL 3432786 at *9-10 (recommending $130,000 emotional distress award where plaintiff endured severe and intense sexually harassing behavior that caused her migraine headaches, nausea, vomiting, sleep disorders, and anxiety lasting for over eighteen months); *Mayo-Coleman v. American Sugar Holdings, Inc.*, No. 14-CV-79, 2018 WL 2684100, at *3, *5 (S.D.N.Y. June 5, 2018) (reducing emotional distress award from $1.7 million to $500,000 as "the greatest amount that can be awarded without being excessive" where plaintiff had both psychological and physical manifestations resulting from extreme sexual harassment).

In another recent case, *Angulo v. 36th Street Hospitality LLC*, No. 19-CV-5075, 2020 WL 4938188, at *2-5 (S.D.N.Y. July 31, 2020), *R. & R. adopted*, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020), the girlfriend of a restaurant owner encouraged their family's babysitter – the plaintiff – to apply for a job as waitress, which she did. Several months into her employment, the plaintiff attempted suicide as the result of trying to cope with an earlier sexual assault that did not involve her employer. After being hospitalized, the plaintiff returned to work at the restaurant. Several months later, while babysitting the owner's daughter, the owner plied her with alcohol, forced her to have

oral sex, raped her, and sexually harassed her for the ensuing three weeks while she continued to work at the restaurant. The plaintiff then attempted suicide two more times, quit her job, and attended in-patient and out-patient treatment programs and therapy over the next two years. She later regularly saw a psychiatrist and was treated and took medication for PTSD, binge eating disorder, bipolar disorder, and borderline personality disorder. When the plaintiff brought an action for sexual discrimination, the restaurant owner never appeared, resulting in a default judgment. As of the inquest, the plaintiff continued to experience panic attacks, distrust of others, and self-cutting, and she remained under the care of and regular treatment by a psychiatrist and therapist.

The Court sets forth the facts of *Angulo* in some detail because the court in that case declined to award the $750,000 in emotional harm damages requested by the plaintiff and instead awarded $300,000. 2020 WL 4938188 at *13-14. In doing so, the court reviewed "other cases in which the plaintiff suffered a sexual assault" and found they "reflect[ed] a trend of awarding emotional distress damages 'in the low-to-mid hundreds of thousands of dollars.'" *Id.* at *13 (quoting *Offei v. Omar*, No. 11-CV-4283, 2012 WL 2086294, at *5 (S.D.N.Y. May 18, 2012) (collecting cases awarding emotional distress damages of $100,000 to $500,000)). That is notable, because the facts in *Angulo* include several corroborating indicia of deep, debilitating, and lasting emotional harm not present here (e.g., actual suicide attempts, ongoing psychiatric treatment, official diagnosis of PTSD and other disorders) even though the plaintiff there was the victim of sexual assault similar to Villalta.

Despite those differences, the Court finds that a substantial award of emotional distress damages is appropriate here. At the inquest hearing, Villalta gave credible

testimony of her mental health struggles and the lasting nature of her conditions attributed to Defendants' egregious discriminatory acts.  Barkats' years-long harassment following two sexual assaults is "'outrageous [and] shocking discriminatory conduct,'" which has had "'significant impact on the physical health of the plaintiff.'" *Ravina*, 2019 WL 1450449 at *12 (quoting *MacMillan*, 873 F. Supp. 2d at 560).

Indeed, Villalta's experience here is far more severe than the plaintiff's in *Ravina*. There, Judge Abrams ordered remittitur of a $750,000 emotional distress damages award down to $500,000 where the plaintiff suffered "significant" but not "egregious" retaliation based on sex that did not involve any allegations of sexual assault.  *Id.* at *12-13.  It is difficult to justify a lesser award here given the egregious conduct to which Villalta was subjected.  That said, unlike here, the plaintiff's testimony of her severe and lasting emotional distress in *Ravina* was corroborated by testimony from her psychiatrist.  Additionally, *Ravina* involved remittitur of a jury verdict, by which the court reduced the emotional distress damages award to the "'maximum amount that would be upheld … as not excessive."  *Id.* at *13 (omission in original) (quoting *Emanian*, 2018 WL 2849700 at *19).

The Court acknowledges that not all of Villalta's emotional difficulties can be one-hundred percent attributed to Barkats.  As the treatment notes of her therapist reflect, Villalta suffered low self-esteem and depression from earlier events.  (Dkt. 122-1 at 5, 7.)  And, at the hearing, Villalta testified that starting at the age of fourteen, she entered into a romantic relationship with a man ten years older than her; although Villalta did not view the relationship as abusive, others did based on their ages.

That said, "it is hornbook law that the wrongdoer takes his victim as he finds h[er]." *Gilbert v. Pan American World Airways, Inc.*, No. 85-CV-4157, 1989 WL 59623, at *1 (S.D.N.Y. June 2, 1989) (declining to reduce the jury's award for emotional distress damages based on prior life experience that "undoubtedly added to the emotional distress she felt"); *see also Stampf*, 761 F.3d at 207 n.5 ("a defendant must take a plaintiff as [he] finds [her] and, therefore, is responsible for the harm [he] inflicts on a person even if that harm is exacerbated by the person's unknown infirmities" (internal quotation marks omitted)); *Gorman v. Prudential Lines, Inc.*, 637 F. Supp. 879, 882 (S.D.N.Y. 1986) ("a tort-feasor must take the victim as it finds him, and is responsible for any aggravation or acceleration of an existing disease or infirmity if the defendant's breach of duty played any part, even the slightest, in producing the injury" (internal quotation marks omitted)).   Moreover, Villalta's earlier childhood experiences pale in comparison to the abuse inflicted on her by Barkats, and Defendants have submitted nothing to the contrary.   Accordingly, while taking Villalta's pre-existing mental health status into account, the Court finds that it does not significantly reduce damages due for emotional harm caused by Barkats.

Taking all relevant considerations into account as set forth above, the Court recommends awarding emotional distress damages in the amount of $350,000.

## C.   Punitive Damages

"'Punitive damages are a discretionary moral judgment that the defendant has engaged in conduct that is so reprehensible that it warrants punishment.'"  *Garcia*, 2019 WL 8274296 at *8 (quoting *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015)).   The purpose of punitive damages is "'to punish the defendant and to deter him

and others from similar conduct in the future.'" *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)).

Under Title VII, a plaintiff may recover punitive damages if she demonstrates that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  "'The terms "malice" or "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination.'"  *Garcia*, 2019 WL 8274296 at *9 (quoting *Kolstad v. American Dental Association*, 527 U.S. 526, 535, 119 S. Ct. 2118, 2124 (1999)).  "The employer's state of mind may be 'inferred from the circumstances,' *Manzo v. Sovereign Motor Cars, Ltd.*, No. 08-CV-1229, 2010 WL 1930237, at *2 (E.D.N.Y. May 11, 2010), *aff'd*, 419 F. App'x 102 (2d Cir. 2011), and 'egregious or outrageous acts may serve as evidence supporting an inference' of the employer's motive or intent[,] *Kolstad*, 527 U.S. at 538."  *Id.*

"'[T]he standard for determining damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a "conscious disregard of the rights of others or conduct so reckless as to amount to such disregard."'"  *Id.* (alteration in original) (quoting *Chauca v. Abraham*, 885 F.3d 122, 124 (2d Cir. 2018)) (relying on certified question resolved in *Chauca v. Abraham*, 30 N.Y.3d 325, 334, 67 N.Y.S.3d 85, 91 (2017)).  "'This standard requires "a lower degree of culpability" than is required for punitive damages under other statutes, as it "requires neither a showing of malice nor awareness of the violation of a protected right."'"  *Id.* (quoting *Kreisler v. Humane Society of New York*, No. 16-CV-8177, 2018 WL

4778914, at *9 (S.D.N.Y. Oct. 3, 2018)). Moreover, "'[t]he NYCHRL permits punitive damages without limitation on the maximum amount.'" *Ravina*, 2019 WL 1450449 at *14 (quoting *Syrnik v. Polones Construction Corp.*, 918 F. Supp. 2d 262, 265 (S.D.N.Y. 2013)). "'Punitive damages are intended not only to punish the tortfeasor but also to deter future reprehensible conduct.'" *Id.* (quoting *Chauca*, 30 N.Y.3d at 331, 67 N.Y.S.3d at 89).

There is no formula or objective measure by which to arrive at a particular amount of punitive damages. *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013). In reviewing an award of punitive damages for excessiveness, however, courts consider "three guideposts" established by the Supreme Court in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575, 116 S. Ct. 1589, 1598-99 (1996): "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee*, 101 F.3d at 809 (citing *BMW of North America*, 517 U.S. at 575, 116 S. Ct. at 1598-99). Courts also review the punitive damages awards in similar cases in order to gauge whether a particular punitive award is excessive. *Payne*, 711 F.3d at 104; *Rosas v. Baiter Sales Co. Inc.*, No. 12-CV-6557, 2018 WL 3199253, at *10 (S.D.N.Y. June 29, 2018) (citing *Lee*, 101 F. 3d at 812).

As Judge Abrams has explained, "the degree of reprehensibility … 'is particularly important and useful because punitive damages are intended to punish, and the severity of punishment … should vary with the degree of reprehensibility of the conduct.'" *Ravina*, 2019 WL 1450449 at *14 (second omission in original) (brackets

omitted) (quoting *Payne*, 711 F.3d at 100).   "In assessing the reprehensibility of a defendant's conduct, the Supreme Court has instructed that courts should 'consider whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.'"   *Thomas v. iStar Financial Inc.*, 652 F.3d 141, 148 (2d Cir. 2011) (brackets omitted) (quoting *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408, 419, 123 S. Ct. 1513, 1521 (2003)).

All those factors are present here.   Barkats' assault and harassment of Villalta is reprehensible in its own right.   Villalta came to Barkats as a financially vulnerable young woman, willing to accept a $30,000 annual salary despite being subjected to sexual assault during her job interview, only to face another sexual assault on her first day of work.   (Villalta Decl. ¶ 4.)   Barkats' conduct was violent, willful, malicious, and intentional.[13]   He caused Villalta both physical and lasting psychological harm.   Any "reasonable employer" would have known that he was violating Villalta's legal rights; all the more so given that Barkats is an attorney and JSB a law firm.

It also was hardly isolated.   As previously explained, Barkats committed similar acts of *quid quo pro* sexual discrimination and harassment just one year prior to his assaults on Villalta.   (Shivecharan Aff. ¶¶ 3-12.)   Barkats' sexual coercion of Villalta and

---

[13] Plaintiff argues, in part, that the Court should make an express finding of willful or malicious conduct because "it will streamline Barkats's almost inevitable future bankruptcy case and adversary proceeding that Plaintiff will be force to file in that forum."   (FFCL at 28.)   The Court does not base its finding that Barkats acted willfully and maliciously on Plaintiff's bankruptcy argument.   Rather, the Court's finding is based strictly on Barkats' acts.

Shivecharan are among the more heinous examples of the hostile work environment Barkats and JSB foisted on all of their female employees, belittling them, criticizing their looks and dress, instilling fear in them, and reducing them to tears.  (Spinelli Aff. ¶¶ 8-16.)

Meanwhile, Barkats remains undeterred despite this lawsuit.  Rather than owning up to his transgressions, he fled the country as a fugitive, all the while delaying Villalta's case and engaging in dilatory litigation tactics.  More pointedly, he has continued to harass Villalta with texts, threatening to retaliate against her for her ongoing efforts to obtain a measure of justice.  Barkats has even gone so far as to attempt to suborn perjury, offering Villalta monetary "reward" for testimony that she was wrong.

Quite simply, Barkats' depraved conduct warrants significant punitive damages.[14]

Villalta has asked the Court award punitive damages in a 2:1 ratio as measured against compensatory damages for emotional distress.  Having asked for $1 million in emotional distress damages, Villalta therefore seeks a punitive damages award of $2 million.  (FFCL at 28.)  Inasmuch as the Court recommends awarding only $350,000 in emotional distress damages, the punitive damages requested would be a 5.7:1 ratio. While punitive damage ratios of that magnitude might be permissible in the right case,

---

[14] As additional justification for hefty punitive damages, Plaintiff asserts that at least three other persons who wish to remain anonymous have disclosed information about Barkats, and, in particular, that he continues to practice law in New York despite being a fugitive, and that he has applied for admission to the bar of Paris, France.  (FFCL at 27; Minkoff Decl. ¶ 3.)  While such conduct is troubling, the Court does not find it an appropriate factor in assessing punitive damages in connection with this case. Moreover, the evidence submitted, which is hearsay, is not admissible.  And, even if the Court did consider that information in formulating a punitive damages award, it would not change the Court's recommendation.  The Court does, however, find it relevant that Barkats was a practicing lawyer at the time of the assaults and immediately ensuing harassment, given the heightened ethical obligations required of attorneys and their awareness of legal prohibitions.

they also may "be close to the line of constitutional impropriety." *State Farm Mutual*, 538 U.S. at 425, 123 S. Ct. at 1524 (referencing cases in which the Court concluded that punitive damages exceeding 4:1 may go too far, but at the same time recognizing that "[s]ingle digit multipliers are more likely to comport with due process" than awards of far greater ratios).

Taking into account all relevant factors, and the "aggravated circumstances of this case," the Court agrees that a "2:1 ratio is both permissible under the Constitution and consistent with the established policies adhered to by [the Second Circuit]." *Turley*, 774 F.3d at 167 (citing, *inter alia*, *Gore*, 517 U.S. at 575, 116 S. Ct. at 1599 (explaining that reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award")). Given Barkats' ongoing reprehensible conduct – coercing sex from multiple would-be employees, threatening Villalta more than five years after Barkats assaulted her, fleeing from justice, and attempting to buy testimony in his favor – and the need for meaningful deterrence, a 2:1 ratio in the amount of $700,000 is highly reasonable here.

As for the third guidepost, Title VII caps punitive damages for an entity the size of JSB (15 to 100 employees) at $50,000. 42 U.S.C. § 1981a(b)(3)(A). But the NYCHRL allows for uncapped punitive damages. N.Y.C. Admin. Code § 8-502(a); *see Caravantes v. 53rd Street Partners, LLC*, No. 09-CV-7821, 2012 WL 3631276, at *21 ("where Title VII claims are pled alongside ... NYCHRL claims, courts have awarded [punitive] damages in excess of the Title VII statutory cap by allocating the excess award to the ... city law claims"). And, under the NYCHRL, Barkats is personally liable in addition to his law firm. Thus, while the Title VII cap provides some guidance, it is

42

substantially outweighed by the other factors and circumstances of this case.  Indeed, punitive damages awards in other comparable cases support a $700,000 punitive damages award here.   *See, e.g.*, *Noonan v. Becker*, No. 14-CV-4084, 2018 WL 1738746, at *9 (S.D.N.Y. April 10, 2018) (awarding $1 million in punitive damages against defaulting defendant police officer based on unchallenged factual allegations of deliberate and outrageous conduct, including false arrest, prosecution of false charges, sexual assault, battery, and rape), *R. & R. adopted*, 2018 WL 2088279 (S.D.N.Y. May 3, 2018); *cf. Rosas*, 2018 WL 3199253 at *12 (remitting punitive damage award from $1.4 million to $700,000 against defendants found liable for race discrimination in employment, where plaintiff was harassed, assaulted, fired, and falsely charged with a crime).

In *Angulo*, discussed earlier in the context of emotional distress damages, the Court awarded only $100,000 in punitive damages, merely a fraction of the economic damages awarded, indicating that the absolute amount fell "within the range of awards in similar circumstances."   2020 WL 4938188 at *15.   Here, however, the particular aggravating circumstances differentiate this case from both *Angulo* and the cases it cites, and justify a significantly higher award – particularly due to Barkats' impeding the litigation with frivolous motion practice, his attempts to purchase favorable testimony, and direct evidence that his sexual coercion and harassment of Villalta extended to other female employees or prospective female employees.

Considering all of the above, the Court recommends awarding punitive damages in the amount of $700,000.

D.      Attorneys' Fees

In both Title VII and NYCHRL actions, a prevailing party may be awarded reasonable fees and costs at the court's discretion. 42 U.S.C. § 2000e-5(k); N.Y.C. Admin. Code. § 8-502(g).   "[A] 'reasonable fee' is a fee that is sufficient to induce a capable attorney to undertake the representation in a meritorious civil rights case." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552, 130 S. Ct. 1662, 1672 (2010). "The Title VII and NYCHRL provisions are substantively and textually similar; therefore, the reasonableness of fees … [is] analyzed the same regardless of which provision" provides the basis for recovery.  *DeCurtis v. Upward Bound International, Inc.*, No. 09-CV-5378, 2011 WL 4549412, at *6 (S.D.N.Y. Sept. 27, 2011) (internal quotation marks omitted).

A plaintiff is the prevailing party "if [she] succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983).   A plaintiff qualifies as a prevailing party by demonstrating a change in the legal relationship between herself and defendants arising from the resolution of the lawsuit.  *See Texas State Teachers Association v. Garland Independent School District*, 489 U.S. 782, 792, 109 S. Ct. 1486, 1493 (1989).  Having obtained default judgment in her favor, "[t]here can be no serious dispute that [Villalta] is the prevailing party in this litigation." *DeCurtis*, 2011 WL 4549412 at *7; *see also Greenburger v. Roundtree*, No. 17-CV-3295, 2020 WL 4746460, at *6 (S.D.N.Y. Aug. 16, 2020) ("a plaintiff who obtains a default judgment is considered a prevailing party" (internal quotation marks and

44

brackets omitted)).   Accordingly, Villalta is entitled to recover her reasonable attorneys' fees and costs incurred in connection with this lawsuit.

The traditional approach to determining a fee award is the "lodestar" calculation, which is the number of hours spent toward the litigation multiplied by a reasonable hourly rate.  *See Healey v. Leavitt*, 485 F.3d 63, 71 (2d Cir. 2007).  The Second Circuit has held that "the lodestar … creates a 'presumptively reasonable fee.'"  *Millea v. Metro-North Railroad Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); and then citing *Perdue*, 559 U.S. at 552, 130 S. Ct. at 1673); *see also Stanczyk v. City of New York*, 752 F.3d 273, 284-85 (2d Cir. 2014) (reaffirming *Millea*).  To arrive at a lodestar calculation, "[t]he party seeking an award of [attorneys'] fees should submit evidence supporting the hours worked and rates claimed."  *Hensley*, 461 U.S. at 433, 103 S. Ct. at 1939.  Villalta has submitted such evidence here, including a declaration from counsel and copies of contemporaneous records of time expended by specific attorneys and paralegals.  (Minkoff Decl. Ex. 3.)

**Hourly Rates:** Courts assess the reasonableness of a proposed hourly rate by considering the prevailing market rate for lawyers in the district in which the ruling court sits.  *Polk v. New York State Department of Correctional Services*, 722 F.2d 23, 25 (2d Cir. 1983).  "The rates used by the court should be current rather than historic hourly rates."  *Reiter v. Metropolitan Transportation Authority of New York*, 457 F.3d 224, 232 (2d Cir. 2006) (internal quotation marks omitted).  "[C]ourts may conduct an empirical inquiry based on the parties' evidence or may rely on the court's own familiarity with the rates if no such evidence is submitted."  *Wong v. Hunda Glass Corp.*, No. 09-CV-4402,

2010 WL 3452417, at *2 (S.D.N.Y. Sept. 1, 2010) (internal quotation marks omitted). Additionally, "the range of rates that a plaintiff's counsel actually charges their clients … is obviously strong evidence of what the market will bear." *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008); *see also Lilly v. County of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) ("The actual rate that counsel can command in the market place is evidence of the prevailing market rate").

The rates Villalta seeks to recover are as follows: $400 for managing and named partner, Michael J. Borrelli; $350 for partner, Alexander T. Coleman; $295 for senior associate, Michael R. Minkoff; between $250 and $200 for prior senior and junior associates handling the matter over the course of the litigation – Todd Dickerson, Kenneth St. John, and Pooja Bhutani; and $100 for paralegals.  Those rates are the same courts in this District and the neighboring Eastern District of New York have awarded for these individuals in similar employment cases.  *See, e.g.*, *Tejada v. La Selecta Bakery, Inc.*, No. 17-CV-5882, 2020 WL 7249393, at *5 (E.D.N.Y. Sept. 23, 2020) (noting rates between $200 and $400 for the Borrelli firm's attorneys "fall within the range typically approved by this Court … [and] find[ing] the requested hourly rates to be reasonable"), *R. & R. adopted*, 2020 WL 6937882 (E.D.N.Y. Nov. 25, 2020); *Salto v. Alberto's Construction, LLC*, No. 17-CV-3583, 2020 WL 4383674, at *7 (S.D.N.Y. July 31, 2020) (approving, on a contested fee motion, requested hourly rates of $350 for partner, Alexander T. Coleman, and $295 per hour for lead associate litigating case, and noting same "are reasonable"); *Perez v. Merrick Deli & Grocery, Inc.*, No. 13-CV-5166, 2019 WL 1492247, at *1 (E.D.N.Y. April 4, 2019) (recognizing that that "[t]his

Court and the neighboring Southern District of New York have routinely approved these billing rates for Borrelli & Associates").

As an additional indicia of reasonableness, the proposed rates are less than the fees that Plaintiff's counsel typically commands from its clients. (*See* Minkoff Decl. ¶¶ 16-17, 22-23, 28-29, 32, 35-36, 36, 39, 41.)  The Court also has reviewed the qualifications of each individual for whom such rates are sought, as well as the roles played by each in this case, and finds the rates charged appropriate for attorneys of their background and experience. (*See* Minkoff Decl. at ¶¶ 8-41.)  Accordingly, the Court finds the rates requested by Villalta's attorneys to be reasonable.

**Hours Worked:** In determining the compensable hours, "the Court must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 371 (S.D.N.Y. 2005) (citing *Gierlinger*, 160 F.3d at 876). "In making this examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger*, 160 F.3d at 876 (internal quotation marks omitted). "The relevant issue ... is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *see also Mugavero v. Arms Acres, Inc.*, No. 03-CV-5724, 2010 WL 451045, at *6 (S.D.N.Y. Feb. 9, 2010) (same).  A court thus should exclude from the lodestar calculation "excessive, redundant or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *see*

*also Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997) ("If the district court concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation").

A prevailing party can recover fees for several categories of work, including pre-litigation work and failed efforts otherwise reasonable pursued.  *See, e.g.*, *Gortat v. Capala Brothers, Inc.*, 621 F. App'x. 19, 23 (2d Cir. 2015) ("there is no rule that [p]laintiffs need achieve total victory on every motion in pursuit of a successful claim in order to be compensated for the full number of hours spent litigating that claim"); *Ni v. Bat-Yam Food Services Inc.*, No. 13-CV-7274, 2016 WL 369681, at *8  (S.D.N.Y. Jan. 27, 2016) (awarding attorneys' fees for hours spent on discovery, discovery-related motions, failed settlement negotiations, and summary judgment motions); *Easterly v. Tri-Star Transportation Corp.*, No. 11-CV-6365, 2015 WL 337565, at *10 (S.D.N.Y. Jan. 23, 2015) (approving fees for time spent, *inter alia*, preparing pleadings prior to the commencement of the action, discovery, discovery disputes, summary judgment motions, and a damages inquest).  Courts have also acknowledged that recoverable time includes pre-suit work arising out of demands and agency filings necessary to exhaust a plaintiff's administrative remedies.  *See, e.g.*, *Lewis v. Roosevelt Island Operating Corp.*, No. 16-CV-3071, 2018 WL 4666070, at *7, *9 (S.D.N.Y. Sept. 28, 2018) (collecting cases and awarding fees for, *inter alia*, pre-suit work arising out of Equal Employment Opportunity Commission ("EEOC") and Freedom of Information Law requests).

The detailed time records submitted reflect that Villalta's attorneys worked an approximate total of 562.1 hours.  (Minkoff Decl. Ex. 3, supplemented by Dkt. 124-3.)

The Court is well-familiar with the nature of this action and the many obstacles with which Villalta's counsel had to contend.  The work performed included, for example, pre-litigation tasks, including an EEOC filing wherein Plaintiff exhausted her administrative remedies before filing the instant action.  It included Villalta's many motions having to contend with Defendants' insistence on a stay pending an arbitration in which they never participated, followed by Villalta's successful motion to lift the stay; Defendants' unsuccessful motion for reconsideration; and Defendants' aborted appeal and unsuccessful motion to stay this matter pending that appeal.  Plaintiff's counsel then had to contend with Defendants' refusal to participate in discovery by filing two motions to compel, both of which this Court granted, followed by Barkats' refusal to comply with the Court's orders.  Then, when this Court recommended entry of default against Defendants, Barkats filed objections to which Plaintiff's counsel had to respond. And, most recently, Plaintiff's counsel had to put together the substantial papers required for the instant inquest.

The time spent, broken down by each individual and supported by contemporaneous documentation, were all hours reasonably necessary toward the litigation of Villalta's successful claims.  In an exercise of billing judgment, Plaintiff's counsel has reduced the requested lodestar fee by 103.5 hours for time recorded for tasks such as unnecessary review by more than one attorney of electronic filing notifications, duplicative billing by multiple attorneys, internal correspondence between Plaintiff's counsel, and time spent reviewing and preparing billing.  (Minkoff Decl. ¶ 6 and Ex. 3, supplemented by Dkt. 124-3.)  Accordingly, Plaintiff seeks recovery, after exercising billing judgment, for a total of 458.6 hours.

The Court finds the time expended, reduced to that figure, is reasonable, particularly in view of Defendants' dilatory and bad faith litigation tactics, which "extended the length and breadth" of the proceedings in this now almost five-year-old litigation. *28th Highline Assocs., LLC v. Roche*, No. 18-CV-1468, 2019 WL 10632851, at *5 (S.D.N.Y. July 29, 2019), *R. & R. adopted*, 2020 WL 5659465 (S.D.N.Y. Sept. 23, 2020); *see Amaprop Ltd. v. Indiabulls Financial Services. Ltd.*, No. 10-CV-1853, 2011 WL 1002439, at *7 (S.D.N.Y. March 16, 2011) (finding expenditure of hours reasonable and noting "it was [defendant's] improper conduct … that presented the legal complexity … and led to the expenditure of time by [plaintiff's] counsel"), *aff'd*, 483 F. App'x 634 (2d Cir. 2012).[15]

Having determined the reasonable fees and hours expended, and performing the requisite calculations, the Court awards reasonable fees in the amount of $128,056.74.

---

[15] The attorney billing records include approximately $2,580 for time spent communicating with reporters about news articles, reviewing such articles, and speaking with the client about the articles. Courts generally do not allow recovery of fees for such activity, particularly as it typically relates to promotional and marketing activity; at the same time, courts have acknowledged the potential for recovery of such fees if the time expended contributes "directly or substantially" to the litigation. *See Souryavong v. Lackawanna County*, 159 F. Supp. 3d 514, 536-37 (M.D. Pa. 2016) (collecting and discussing cases), *aff'd*, 872 F.3d 122 (3d Cir. 2017). Here, based on review of the detailed time records, the vast majority of the time incurred for communicating with reporters came just after filing of the complaint, which unsurprisingly garnered attention in the news, and appears to have been prompted by contacts from reporters rather than the firm's affirmative efforts. Press coverage of the action appears to have contributed directly to Villalta's litigation by producing leads to potential witnesses or additional victims of Barkats. Moreover, although Defendants have challenged the amount of Villalta's attorney's fees generally, they raised no concern about these particular charges. Accordingly, the Court awarding recovery of these fees is appropriate.

**E.     Costs**

The list of recoverable costs is "set out in 28 U.S.C. § 1920, the general statute

governing the taxation of costs in federal court."  *Arlington Central School District Board*

*of Education v. Murphy*, 548 U.S. 291, 298, 126 S. Ct. 2455, 2460 (2006).   The list of

taxable costs includes: (1) fees of the clerk and marshal; (2) fees of a court reporter for

all or any part of the stenographic transcript necessarily obtained for use in the case;

(3) fees and disbursements for printing and witnesses; (4) fees for exemplification and

copies of papers necessarily obtained for use in the case; (5) docket fees under 28

U.S.C. § 1923;  and  (6) compensation of court-appointed experts,  compensation of

interpreters, and salaries, fees, expenses, and costs of special interpretation services

under 28 U.S.C. § 1828.   *See* 28 U.S.C. § 1920.   Costs associated with copying, docket

fees, and other miscellaneous fees may also be recovered pursuant to Local Civil Rule

54.1.

Villalta has submitted a detailed statement of costs in the amount of $2,312.34

which includes postage, arbitration and mediation filing fees, court filing fees, copying

costs, PACER fees, service of process, and legal research charges.[16]   (Minkoff Decl.

---

[16] In 2004, the Second Circuit recognized that the costs of electronic legal research are compensable, and therefore may be awarded in connection with an application for attorneys' fees, but only where the charges are not already accounted for in the attorneys' hourly rate.  *See Arbor Hill Concerned Citizens Neighborhood Association*, 369 F.3d at 97-98 ("We agree that the use of online research services likely reduces the number of hours required for an attorney's manual research, thereby lowering the lodestar, and that in the context of a fee-shifting provision, the charges for such online research may properly be included in a fee award.  If [the firm] normally bills its paying clients for the cost of online research services, that expense should be included in the fee award."); *see, e.g.*, *Anderson v. City of New York*, 132 F. Supp. 2d 239, 245-47 (S.D.N.Y. 2001) (allowing for recovery of service, filing, photocopying, and witness fees, as well as computerized legal research costs).

¶ 7 and Ex. 4.)   The Court has reviewed that list and finds the costs set forth are recoverable.   However, a meal charge of $27.06 will be deducted.   Accordingly, the Court awards costs of $2,285.28.

## F.     Post-Judgment Interest

Post-judgment interest shall be imposed "on any money judgment in a civil case recovered in a district court."   28 U.S.C. § 1961(a).   The interest rate is calculated "'from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[ ] the date of the judgment,'" and "'shall be computed daily to the date of payment except as provided in section 2516(b) of this title and section 1304(b) of title 31, and shall be compounded annually.'" *Antoine*, 489 F. Supp. 3d at 102 (alteration in original) (quoting 28 U.S.C. § 1961(a)-(b)). The amount upon which the post-judgment interest accrues "'includes compensatory damages, punitive damages, and fee awards.'"   *Id.* (quoting *Koch v. Greenberg*, 14 F. Supp. 3d 247, 287 (S.D.N.Y. 2014)).   Accordingly, the Court awards post-judgment interest at the statutory rate from the date of entry of judgment on all damages awarded herein.

## Conclusion

For the foregoing reasons, I recommend awarding Plaintiff: (1) lost wages damages in the amount of $24,352.85, inclusive of pre-judgment interest; (2) emotional harm damages in the amount of $350,000; (3) punitive damages in the amount of $700,000; (4) reasonable attorneys' fees in the amount of $128,056.74; (5) costs in the

amount of $2,285.28; and (6) post-judgment interest in an amount to be set by the Clerk of Court.

## Procedures For Filing Objections

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of Court, with extra copies delivered to the Chambers of the Honorable Ronnie Abrams, U.S.D.J., United States Courthouse, 40 Foley Square, New York, NY 10007, and to the Chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, NY 10007.  **FAILURE TO FILE TIMELY OBJECTIONS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  April 16, 2021
        New York, New York

Copies transmitted this date to all counsel of record.